801 F.2d 719
 2 UCC Rep.Serv.2d 25
 MURDAUGH VOLKSWAGEN, INC., Plaintiff,
and
Eunice B. Murdaugh, and Charles Altman as Trustee for
Murdaugh Volkswagen, Inc., Bankrupt, Appellees,
v.
The FIRST NATIONAL BANK OF SOUTH CAROLINA, a corporation and
Buchanan Volkswagen, Inc., a corporation, Defendants,
and
South Carolina National Bank as Successor and Merger of The
First National Bank of South Carolina, a
corporation, Appellant.
 No. 85-2248.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 2, 1986.
Decided Sept. 25, 1986.
 
 G. Dana Sinkler (Sinkler, Gibbs & Simons, L. Henry McKellar, Associate Gen. Counsel, South Carolina Nat. Bank on brief), for appellants.
 Ellis I. Kahn (Solomon, Kahn, Smith & Baumil on brief), for Steven Kapustin (Bluestein, Rutstein & Mirarchi, P.C. on brief), for appellees.
 Before WIDENER, HALL and SPROUSE, Circuit Judges.
 K.K. HALL, Circuit Judge:
 
 
 1
 South Carolina National Bank appeals an order of the district court denying its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The order was entered following a judgment based upon a jury verdict in favor of plaintiffs, Eunice B. Murdaugh, and Charles Altman, trustee in bankruptcy for Murdaugh Volkswagen, Inc. Finding no error, we affirm.
 
 I.
 
 2
 This is the third time that this case has come before us. The previous history of the matter is set forth in our earlier two opinions, Murdaugh Volkswagen, Inc. v. First National Bank, 639 F.2d 1073 (4th Cir.1981), and Murdaugh Volkswagen, Inc. v. First National Bank of South Carolina, 741 F.2d 41 (4th Cir.1984). A brief summary follows.
 
 
 3
 In January, 1976, Murdaugh Volkswagen, Inc., a company which sold new and used automobiles in Charleston, South Carolina, and Eunice Murdaugh, the corporation's president and, since 1974, its sole stockholder, filed this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1 and 2. The complaint alleged a conspiracy to restrain or monopolize trade on the part of defendants, First National Bank of South Carolina and Buchanan Volkswagen, Inc.[1] Plaintiffs also alleged pendent state claims of defamation and wrongful dishonor of corporate checks. The district judge refused to allow the pendent state claims to proceed to trial, although no order was ever entered dismissing those claims. Following a trial of the antitrust claims, the jury returned a verdict in favor of Mrs. Murdaugh and the corporation. The district court, however, granted defendants' motion for judgment notwithstanding the verdict and we affirmed. 639 F.2d 1073.
 
 
 4
 When plaintiffs then sought to proceed with their pendent state claims, the district court entered an order denying any further discovery on the ground that its prior judgment had effectively dismissed the pendent claims. On appeal to this Court, we held that those claims had never been adjudicated and dismissed plaintiffs' appeal as premature. 741 F.2d 41. Subsequently, the pendent state claims for defamation and wrongful dishonor of corporate checks were tried by a jury. It is this verdict which is at issue in the present appeal.
 
 
 5
 The evidence below revealed that Murdaugh Volkswagen, Inc. was a family-managed car dealership that during the early 1970's had approximately sixty employees. Between 1969 and 1972, the company embarked upon a program of substantial expansion and capital expenditure. In the summer of 1974, Mrs. Murdaugh had a net worth of $911,923, including real estate valued at $730,000 (subject to outstanding mortgages of over $430,000), stock in Murdaugh Volkswagen, Inc. valued at approximately $221,000, and accounts receivable of $117,037. Mrs. Murdaugh drew a salary from the corporate plaintiff of $3,000 per month. She estimated that the Volkswagen dealership was worth a total of $500,000. Nevertheless, the company was experiencing financial difficulties, particularly in the area of available cash.
 
 
 6
 From 1955 until July, 1975, the corporation had accounts, including a checking account, with the South Carolina National Bank's predecessors in interest, Carolina Savings Bank and First National Bank of South Carolina (collectively, the "Bank"). The parties agreed that the relationship between the company and the Bank had been good, or at least satisfactory, until mid-1974. Since 1970, the Bank had floor-planned the company's inventory, an arrangement which generated over $1,000,000 in retail car loans for the Bank.[2]
 
 
 7
 In the spring of 1974, Mrs. Murdaugh contacted the Bank to apply for a Small Business Administration loan in order to avoid a potential cash problem caused by the amortization of the company's $70,000 worth of debt incurred during the previous year. The Bank requested a corporate audit, which was prepared and presented to Bank officials in July, 1974. The audit revealed a net operating loss of $63,905.44 and an "overdraft" of $22,209.58.[3] The Bank declined to participate in the loan and a meeting was arranged for early September between Mrs. Murdaugh, her son, William Murdaugh, who was the corporation's general manager, and several Bank officials.
 
 
 8
 At this meeting, Bank representatives claimed that the company was "out of trust," i.e. had sold automobiles financed by the Bank without making payment to the Bank after the sale. Mrs. Murdaugh denied this allegation. Nevertheless, following the meeting, the Bank began to institute certain procedures which changed the way it had dealt with the car dealership in the past. Among other things, the Bank demanded physical possession of the used and new car titles, a security interest in the equipment located at the car dealership, and a mortgage on Mrs. Murdaugh's home which was in her name. The fulfillment of these demands was a condition precedent for the new floor-planned cars remaining at the company's premises.
 
 
 9
 In October, 1974, the Bank further required Mrs. Murdaugh to use a portion of a $35,000 loan, which had been made to her personally, to pay off a $20,000 obligation of the Volkswagen agency. Shortly thereafter, the Bank notified Mrs. Murdaugh of its intent to cancel the floor plan[4] and also used monies from the corporate reserve accounts, without authorization or an accounting, to pay loan payments of the corporation, as well as individual debts of Mrs. Murdaugh's husband.
 
 
 10
 In addition, as of September 19, 1974, Evelyn McSwain, an assistant vice-president of the Bank, was assigned to monitor the corporate checking account and to decide each day which checks written against the account were to be paid and which deposits were to be credited. An inter-office Bank memo dated October 17, 1974, confirmed that "The Murdaugh checking account is now handled by Evelyn McSwain and only the checks are honored that are OK'd by [Bank vice-president James Strider]." Previously, there had been an agreement between the parties that checks deposited into the corporate account were to be given immediate credit.
 
 
 11
 Mrs. Murdaugh's testimony focused on twenty checks, totalling $5,967.48, which were returned for insufficient funds between March and June, 1975, and which plaintiffs claimed were wrongfully dishonored by the Bank. According to Mrs. Murdaugh, this was the first time in her twenty years of doing business with the Bank that any checks had been returned. She identified each of the checks at issue, including two payable to her franchisor, Volkswagen of America, three to Buchanan Volkswagen, Inc., two to C & S National Bank, and the rest to various suppliers and other businesses. Mrs. Murdaugh reported the date on which each check was returned for insufficient funds and recited the balance in the checking account on that date, as reflected on the written statement supplied to the corporation by the Bank. In each instance, the balance exceeded the amount of the returned checks. Mrs. Murdaugh further stated that it had always been her understanding that if a check were deposited before 1:00 p.m., it could be drawn against that same day, and if it were deposited after 1:00 p.m., it could be drawn against as of the next day.
 
 
 12
 According to Mrs. Murdaugh, after the checks were returned for insufficient funds, the company's parts suppliers placed her on COD (cash on delivery), thereby adding to the company's financial difficulties. Mrs. Murdaugh stated that she had not been on COD with these suppliers before the March-June, 1975, period and, because of the returned checks, was on COD with most parts suppliers by July, 1975. She also said that around May, 1975, Volkswagen of America was threatening to terminate her franchise, but subsequently decided to continue it until 1976.
 
 
 13
 Mrs. Murdaugh claimed that the Bank's wrongful dishonor of these checks led to the ruination of her dealership which, in 1977, eventually filed for bankruptcy, and to the loss of her home through foreclosure. She further claimed that as a result of the wrongful dishonor she lost the property where the Volkswagen dealership was located, as well as two other properties. According to Mrs. Murdaugh, in addition to being humiliated and embarrassed, she developed depression and other severe emotional and physical problems, which required treatment and medication.
 
 
 14
 Ronald Peters, the company's office manager and bookkeeper from September, 1974, through October, 1976, testified that when he first began working for the car dealership, he believed that its financial condition was sound. Peters stated, however, that by early 1975 the company had a very small cash flow. According to Peters, beginning around November, 1974, the Bank required him to bring the deposits and passbook to McSwain on a daily basis. Peters stated that he generally took the deposits to McSwain between 1:00 and 2:00 p.m. each day and that she would go through the checks offered for deposit, refusing to accept and credit certain ones for deposit to the account. According to Peters, eventually all out-of-town checks were automatically refused. He further testified that when checks were not accepted, the company sometimes deposited them at another bank where they were accepted.
 
 
 15
 Peters also said that there were occasions when McSwain would phone him to inform him that there were checks presented for payment in excess of the funds available in the account. Peters agreed that on those occasions he and McSwain discussed the situation and decided which checks would be paid and which ones would be returned. The bookkeeper confirmed that the return of checks for insufficient funds had a negative impact on the company's ability to do business. According to Peters, suppliers placed the dealership on COD probably in 1976, but not during 1974 or 1975.
 
 
 16
 Jimmy White, a former sales manager at Murdaugh Volkswagen, Inc., testified that sometimes the company's purchase orders would not be accepted by certain suppliers, who then required payment by check at the time of delivery. According to White, the company was on COD with nearly everyone by November, 1974.
 
 
 17
 McSwain confirmed that before she began monitoring the checking account of Murdaugh Volkswagen, Inc., the company's deposits were given immediate credit and that out-of-town checks were credited to the account the same evening on which they were deposited. McSwain testified, however, that sometime after she became involved with the account, the procedure changed and she delayed crediting the company's account with those checks until they cleared their out-of-town banks. She could not recall the precise date on which she stopped giving immediate credit to third-party checks. However, she stated that it could have been more than four months after she began monitoring the account in September, 1974, but probably not later than March, 1975, or six months after the monitoring began. According to McSwain, she had never performed this sort of procedure with an account before.
 
 
 18
 McSwain also testified that although 1:00 p.m. is the official end of a banking day, in monitoring this company's account she made her decision whether to accept or return a check by 11:00 a.m. each day. Therefore, according to McSwain, deposits made before 1:00 p.m. but after 11:00 a.m. were not considered in arriving at the account's daily balance.
 
 
 19
 McSwain testified that she was in daily contact with Mrs. Murdaugh, her son William, or Peters concerning which checks would or would not be paid. She stated that she kept track of the account by means of handwritten worksheets, which were not furnished to plaintiffs, and which reflected a balance that was lower than the balance reported on the bank statement sent to the company:
 
 
 20
 THE COURT: That's how you-all would figure out what the balance was at that period of time deducting from the balance those checks that you were going to wait to clear?
 
 
 21
 McSWAIN: Yes, sir. You can pick up a statement and look at it and show a three thousand dollar balance, but I could only pay up to a thousand dollars.
 
 
 22
 THE COURT: Allow checks to be written against that account up to some amount?
 
 
 23
 McSWAIN: Yes, sir.
 
 
 24
 McSwain said that the company was aware of the 11:00 a.m. deadline but further stated that she did not know whether any formal notice concerning the new procedures had been given to Mrs. Murdaugh or the corporation.
 
 
 25
 William Murdaugh expressed his belief that the banking deadline was 2:00 p.m. He denied being informed of any earlier deadline by the Bank. Mrs. Murdaugh's other son, Marvin Murdaugh, Jr., M.D., presented testimony concerning his mother's depression, insomnia, and gastritis, which he had been treating with prescription medication, including anti-depressants and tranquilizers, since 1975.
 
 
 26
 The Bank offered the testimony of John Gamble, a certified public accountant, who supervised the preparation of the company's 1974 audit. Mr. Gamble reported deficiencies in the accounting procedures and record keeping of the car dealership as early as 1971. Another certified public accountant, James Louis Grant, also testified on behalf of the Bank concerning the declining financial condition of the plaintiff corporation between 1970 and 1975 and the condition of the corporate books, which he described as poor. Steve Meaux, the new and used car manager for Murdaugh Volkswagen, Inc. from 1972 through November of 1974, testified that the dealership was "on COD with just about everybody we did business with."
 
 
 27
 Documentary evidence demonstrated that on March 31, 1975, Volkswagen of America gave a termination notice to the plaintiff corporation to take effect in sixty days. The notice was later rescinded after the dealership obtained a new floor plan in July, 1975. Volkswagen of America consultant Jeffrey Bridges, testifying by videotape, stated that problems with the dealership persisted. According to Bridges, he visited the company in September, 1975, specifically to discuss the matter of returned checks, which the franchisor viewed as a "serious problem."
 
 
 28
 On April 5, 1976, Volkswagen of America issued a new termination notice. An earlier letter, dated January 30, 1976, from the franchisor's regional manager, cited the matter of returned checks among the reasons for the termination decision. On May 31, 1977, Murdaugh Volkswagen, Inc. filed for bankruptcy.
 
 
 29
 After hearing the evidence and receiving instructions, the jury returned a verdict in favor of the corporate plaintiff in the amount of $268,318.85 for wrongful dishonor of checks. The award to Murdaugh Volkswagen, Inc. was in the amount of the value of its scheduled assets at the time the corporation filed for bankruptcy in May of 1977. The jury also found in favor of Mrs. Murdaugh in the amount of $175,000 for defamation caused by the wrongful dishonor.
 
 
 30
 Subsequently, the Bank filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The motion was denied and this appeal followed.[5]
 
 II.
 
 31
 On appeal, the Bank contends that (1) the trial court erred in instructing the jury that Mrs. Murdaugh could qualify as a customer of the Bank under South Carolina law; (2) there was no proof that checks were wrongfully dishonored; (3) there was insufficient proof that plaintiffs' damages were proximately caused by any wrongful dishonor; and (4) the cumulative effect of certain evidentiary rulings requires a new trial. We disagree with each of these contentions.
 
 
 32
 South Carolina's Uniform Commercial Code provides that "[a] payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item." S.C.Code Ann. Sec. 36-4-402. A customer is defined as "any person having an account with a bank or for whom a bank has agreed to collect items...." S.C.Code Ann. Sec. 36-4-104(1)(e). In this case, the trial court instructed the jury as follows:
 
 
 33
 ... where the bank looks directly to an officer or a shareholder of a corporation for satisfaction of the debts of the corporation, and requires that individual to personally guarantee the debts of the corporation by encumbering their assets, and where that person controls the financial affairs of the corporation and personally vouched for the corporate fiscal responsibilities, that person may also in the jury's, if the jury decides that, that person may also be considered a customer of the bank having an account therein.
 
 
 34
 * * *
 
 
 35
 * * *
 
 
 36
 The second element in defamation that the Plaintiffs must prove is that the alleged defamatory oral or written statements were of and concerning the particular Plaintiff under consideration. It is undisputed that the alleged oral and written statements concerned the corporate Plaintiff. Generally a corporate officer or a majority shareholder like Mrs. Murdaugh is not defamed by the slander or libel of the corporation for whom she works. However, where the facts and circumstances of the case indicate that the corporation and the person are synonymous, including the control exercised by the individual over the corporation, the recognition by the person uttering the defamation that the individual officer or shareholder is the person ultimately responsible for the business decisions and financial problems of the corporation; and in a case concerning defamation of a corporation's financial integrity, by the corporation's bank, the individual person's assets were pledged to cover the corporate liabilities, a corporate officer or shareholder can be said to have been defamed by the libel or slander of the corporation if you find the defamation personally concerned the individual Plaintiff.
 
 
 37
 This is a question of fact for you as a trier of fact to determine.
 
 
 38
 You must find that the alleged defamation affects or is of and concerning each of the Plaintiffs, Mrs. Murdaugh and/or Murdaugh Volkswagen in order to find that element satisfied.
 
 
 39
 The Bank argues that the trial court's instruction was erroneous. According to the Bank, Mrs. Murdaugh has no standing to assert a claim for wrongful dishonor or defamation because there was no proof that she had an account with the Bank and she was not a customer of the Bank within the meaning of S.C.Code Ann Secs. 36-4-402 and 36-4-104. We conclude that the Bank's construction of the South Carolina statutes is unjustifiably narrow. In this case, the evidence demonstrates the close intertwinement between Mrs. Murdaugh and her company, of which she was president and sole stockholder. Moreover, the Bank clearly treated Mrs. Murdaugh and the corporate depositor as one entity. In their testimony, both Strider and McSwain referred to the "Murdaughs" and "the individuals at Murdaugh Volkswagen" as customers of the Bank. More importantly, the Bank consistently and repeatedly looked to Mrs. Murdaugh to assume the corporation's obligations by requiring her to mortgage her own home and personally borrow funds for the company's benefit. At least under the facts presented by this case, we hold that Mrs. Murdaugh was a customer of the Bank under South Carolina law and that the trial court's jury charge on this issue was not erroneous.
 
 III.
 
 40
 We next consider whether there was evidence to support the jury's verdict of wrongful dishonor. In reviewing the trial court's refusal to grant judgment notwithstanding the verdict, we, like the trial court, may not substitute our judgment of the facts for that of the jury or pass on the credibility of the witnesses. Furthermore, we are obliged to view the evidence in the light most favorable to the nonmoving parties, in this case the plaintiffs, and to give them the benefit of all inferences fairly supported by the evidence, even though contrary inferences may be drawn. See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962); Lust v. Clark Equipment Co., Inc., 792 F.2d 436 (4th Cir.1986); Howard v. McCrory Corp., 601 F.2d 133, 137 (4th Cir.1979); Mays v. Pioneer Lumber Corporation, 502 F.2d 106, 107-108 (4th Cir.1974). After viewing the evidence in this manner, judgment notwithstanding the verdict may be granted only if the evidence points so strongly in favor of the moving party that reasonable minds could not find for the nonmoving party. See, e.g., Howard v. McCrory Corp., supra at 137.
 
 
 41
 Applying this restrictive standard, we conclude that the evidence was sufficient to sustain the jury's finding that the Bank wrongfully dishonored the checks at issue. It is undisputed that for some time the Bank had an agreement with the plaintiffs to give immediate credit to the company's deposits. Such an agreement is valid and binding under South Carolina law. S.C.Code Ann. Sec. 36-4-103. Although the Bank decided to terminate that agreement at some point after problems with the account arose, there is no evidence to show that the Bank ever formally notified plaintiffs of that decision. Nor is it clear when the decision to stop granting immediate credit was made. Although evidence on this point was conflicting, the jury was certainly entitled to infer from McSwain's testimony that the decision to refuse immediate credit of deposits and hold out-of-town checks for clearance was made as late as April, 1975, around the time that the checks at issue here were returned for insufficient funds.[6]
 
 
 42
 Mrs. Murdaugh testified as to the date each of the twenty checks was returned and McSwain stated that the checks were presented for payment the evening before their return. Moreover, the jury heard testimony from Mrs. Murdaugh concerning the balance of the corporate account on the return date, as reflected by her bank statement. In each instance, the balance recorded on the statement was sufficient to cover the check. Of course, the jury also heard conflicting evidence on this point from McSwain, but it was entitled to resolve the conflict and, in doing so, to consider the credibility of the witnesses. Although, as the trial court instructed, the balance reflected on the bank statement "does not automatically mean that at any time during the banking day ... the account contained that amount," the jury was certainly entitled to consider the bank statement along with all of the other evidence and all reasonable inferences to be drawn therefrom. See, Crout v. South Carolina National Bank, 273 S.C. 702, 258 S.E.2d 924 (1979).
 
 
 43
 Given the evidence that daily deposits to the account were being made and that, contrary to its agreement, the Bank was refusing to credit all of those deposits, it was not unreasonable for the jury to conclude that in light of the bank statement balances there were sufficient funds available to pay the checks at issue. Therefore, the jury's verdict in favor of both plaintiffs must not be disturbed.
 
 IV.
 
 44
 Turning our attention to the damages issue, we find that the jury's award is supported by sufficient evidence. Under S.C.Code Ann. Sec. 36-4-402:
 
 
 45
 A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. When the dishonor occurs through mistake liability is limited to actual damages proved. If so proximately caused and proved damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case.
 
 
 46
 According to the Reporter's official comments following this code section, in cases where a bank's failure to pay was not merely a mistake but the result of bad faith, the liability of the bank is not limited to nominal damages. The comments state that the dishonor of a check presumptively results in injury to the credit of the drawer and that substantial damages are recoverable in such a situation, although they should be temperate or moderate in amount.
 
 
 47
 In this case, the trial court instructed the jury in pertinent part as follows:
 
 
 48
 In considering the effect of defamation or wrongful dishonor, you should consider the time, manner and language of the defamation and dishonor, and the character, standing and influence of the parties involved. In considering the damages resulting from defamation, you should consider all of the facts and circumstances of the case as disclosed by the evidence, the nature and character of the charges, the language, manner and style in which such charges were made or published, and their tendency, the occasion of which they were published, the extent of their circulation, their probable effect upon those whose attention it came to, and the natural and probable effect upon the individual Plaintiff's feelings and both Plaintiffs' standing in the business community and the public estimation may have been affected.
 
 
 49
 Without objection by the Bank, the court further charged the jury with respect to actual damages, including general and special damages, and punitive damages.[7] Moreover, in defining special damages, the trial court stated that they:
 
 
 50
 are designed to compensate someone for the loss of a business, other economic injuries or other damages capable of monetary computation. These damages must proximately result from the conduct of a Defendant. They must compensate the Plaintiff for the loss occasioned by the Plaintiff's misconduct and be proven by the Plaintiffs by the preponderance or greater weight of the evidence. Remember misconduct proximately causes an injury if it directly and in continuous and natural sequence produces or contributes substantially to the loss so that it can reasonably be said except for the misconduct of the bank, that is, the dishonoring of checks, if you find they did that, the defamation, if you find they did that, then except for that, the Murdaughs would not have lost or been damaged.
 
 
 51
 (emphasis added).
 
 
 52
 In light of the court's instructions and applicable South Carolina law, we conclude that the evidence and the permissible inferences which can be drawn from that evidence support a finding that the Bank's wrongful dishonor was not in good faith and produced or contributed substantially to plaintiffs' losses. Although the evidence was in conflict regarding the time that the financially-troubled company was placed on COD by its suppliers, the jury was entitled to resolve that conflict in favor of plaintiffs' being placed on a cash-only basis after the wrongful dishonor of the checks. It was also not unreasonable for the jury to find that the dealership's inability to purchase on credit was, in effect, the ultimate blow to plaintiffs' struggle for survival. The evidence, moreover, makes clear that the issue of returned checks was viewed by the dealership's franchisor as a serious problem which figured prominently among its reasons for finally terminating the franchise. Given these circumstances, we find that the test of proximate cause is satisfied and that the jury's award for wrongful dishonor and defamation arising out of that dishonor must be affirmed.[8]V.
 
 
 53
 Finally, we see no merit in the Bank's contention that a new trial is required to correct the cumulative effect of three of the trial court's evidentiary rulings. Initially, the Bank argues that by permitting Mrs. Murdaugh to have standing to assert a claim for wrongful dishonor and defamation, prejudicial evidence was admitted concerning her physical, mental, and emotional state. Appellant's argument on this point must be rejected in light of our previous holding that Mrs. Murdaugh had standing to assert those claims.
 
 
 54
 The Bank's second claim of error relates to the testimony of William Murdaugh, concerning a Bank employee who allegedly attempted to extort money from the dealership for financing sales. The trial court later instructed the jury to disregard this testimony for failure to prove that the Bank had knowledge of the employee's conduct. We are satisfied that the court's instruction cured any error in this regard.
 
 
 55
 Finally, we perceive no error in the Bank's claim that it was harmed by the inclusion of Buchanan Volkswagen, Inc., as a co-defendant. After the trial court dismissed the competing dealership at the close of plaintiffs' case, the jury was instructed that it should no longer be concerned with the co-defendant. Although plaintiffs failed to prove a case of defamation against Buchanan Volkswagen, Inc., we find no undue prejudice in the admission of any evidence through the co-defendant which would require a new trial.
 
 VI.
 
 56
 For the foregoing reasons, the district court's decision is affirmed.
 
 
 57
 AFFIRMED.
 
 
 
 [1]
 South Carolina National Bank is the successor by merger of the original defendant, First National Bank of South Carolina. Buchanan Volkswagen, Inc. is a dealership that competed with Murdaugh Volkswagen, Inc
 
 
 [2]
 Floor-planning is the means by which a car dealer purchases its inventory. Under this arrangement, the dealer orders the cars, the bank pays for them, and the dealer then owes the bank for the cars. The bank makes money on the arrangement from the interest paid by the dealer and from the dealer's referral of its customers to the bank for the financing of their retail car purchases
 
 
 [3]
 According to Mrs. Murdaugh's testimony, the "overdraft" shown on the audit did not mean the corporate bank account was actually overdrawn, but merely reflected checks which had been made payable to Mrs. Murdaugh and never cashed. According to Mrs. Murdaugh, these checks were posted on the corporation's books and subtracted from the amount the company had in its bank account but were never presented to the Bank for payment. In effect, she claimed, they became loans to the corporation. Mrs. Murdaugh's bookkeeper, Ronald Peters, confirmed that the overdraft in this case did not necessarily mean an overdraft in the bank account
 
 
 [4]
 The floor plan with the Bank was cancelled effective December 31, 1974, and the corporation did not obtain a new floor plan until July, 1975, when it entered into an arrangement with a credit institution
 
 
 [5]
 At the close of plaintiff's case, the trial court had directed a verdict in favor of the other defendant, Buchanan Volkswagen, Inc
 
 
 [6]
 Furthermore, there was a direct conflict in the testimony concerning the deadline for crediting deposits on the banking day. Three different times, ranging from 11:00 a.m. to 2:00 p.m., were presented to the jury. Certainly it was within the province of the jury to weigh that testimony, to assess the credibility of the various witnesses, and to take into account the history of the Bank's dealings with plaintiffs. Given the testimony concerning an afternoon deadline of at least 1:00 p.m., coupled with Peters' testimony that he brought deposits to the Bank usually around 1:00 or 2:00 p.m., the jury had grounds to believe plaintiffs' witnesses rather than the Bank's
 
 
 [7]
 No punitive damages were awarded to either plaintiff
 
 
 [8]
 Given the jury's finding that the Bank actions led to the ruination of the dealership, it was not unreasonable for the jury to consider the value of the bankrupt company's schedule of assets in calculating the award for the corporate plaintiff. Moreover, in awarding Mrs. Murdaugh damages, the jury was entitled to consider the loss of Mrs. Murdaugh's home, despite the fact that the foreclosure was by another financial institution and occurred after the plaintiffs had ceased dealing with the Bank