780 P.2d 434

**G.P. SCHOENFELDER,**
**Plaintiff–Appellee,**

v.

**The ARIZONA BANK, an Arizona corporation, Defendant–Appellant.**

**No. 1 CA–CIV 9925.**

Court of Appeals of Arizona,
Division 1, Department A.

April 20, 1989.

As Amended April 25, 1989.

Review Granted in Part and Denied in Part Oct. 11, 1989.

**602**

Carson, Messinger, Elliott, Laughlin & Ragan by Michael J. Pearce and Michael P. Anthony, Phoenix, for plaintiff-appellee.

Jennings, Strouss & Salmon by Maurice Portley, Rick N. Bryson and James M. Ackerman, Phoenix, for defendant-appellant.

GERBER, Judge.

The Arizona Bank (Bank) appeals from the entry of partial summary judgment for G.P. Schoenfelder which ordered the Bank to recredit the checking account of Apex Development Corporation (Apex) for four checks paid over Schoenfelder's forged signature. Because we hold that Schoenfelder does not have standing as a customer of the Bank under A.R.S. §§ 47–4104(A)(5) and 47–4401, we need not address other issues raised by the Bank on appeal.

## FACTS

In April 1986, G.P. Schoenfelder, as seller, and Apex Development Corporation, as buyer, were nearing the close of escrow on a four-acre parcel of land. Apex was financing development of the parcel with a construction loan secured by a lien on the property, and Schoenfelder wanted assurance that all disbursements from the loan proceeds would be properly applied to the development project.

After discussing this matter, Robert Silvert, Apex's president, and Schoenfelder agreed that the loan proceeds would be placed in an account at the Bank's 16th Street and Morten branch on which funds could be drawn only with Schoenfelder's written authorization.[1] Silvert and Schoenfelder met at an office of Transamerica Title and called the 16th Street and Morten branch for advice on how to structure the account. The two men took turns speaking on the telephone to a person Schoenfelder believes was either Wilma Hall or Gail Allen. After Silvert, Schoenfelder, and the Bank employee discussed the requirement that Schoenfelder approve all disbursements in writing, the Bank employee suggested a two-signature account. The par-

---

1. At that time, Apex had two existing accounts   at the Bank's 16th Street and Morten branch.

ties decided that Silvert, Schoenfelder, and Schoenfelder's controller, D.W. Rawn, would be signatories, and that two signatures would be required for any disbursement, one of which had to be Schoenfelder's. The Bank employee assured Schoenfelder that, under this arrangement, funds could not be disbursed from the account without his signature.

Some time thereafter, Silvert opened a checking account at the 16th Street and Morten branch in the name of "Apex Development Corp." Silvert dealt with Bank employee Wilma Hall. He did not indicate to Hall why Apex was opening another account with the Bank. He produced no documents indicating why the account was opened or the purpose for which the funds were to be used. Silvert left the Bank with a signature card which he took to Schoenfelder's office. Rawn and Schoenfelder signed it, dated it April 25, 1986, photocopied it, and returned it to Silvert. At this time, the signature card reflected that account # 088–160999 was a corporate account in the name of "APEX DEVELOPMENT CORP." and was signed by Schoenfelder, Rawn, and Silvert. A box on the card next to printed words stating, "CHECK HERE IF TWO SIGNATURES ARE REQUIRED," was marked with a handwritten "X." The card contained no entries reflecting the amount of the opening deposit, the date the account was opened, the person who opened the account, or the person by whom the account was approved.[2]

At some point after Silvert left Schoenfelder's office, additional notations were added to the card, reflecting an opening deposit of $138,000, an opening date of "4–28–86," an indication that it was opened by "W. Hall," and illegible handwritten initials of the person approving the account. The signature card also bore a rubber stamp imprint stating in large letters,

"TWO SIGNATURES REQUIRED." Further, under the printed words stating, "CHECK HERE IF TWO SIGNATURES ARE REQUIRED," the words "1 must be G.P. Schoenfelder" were typed in.[3]

On April 28, 1986, Silvert deposited two checks totalling $148,036.21 payable to Apex into the account.[4] According to Hall, Silvert returned the signature card to the 16th Street and Morten branch on April 30, 1986. At the time Hall saw the card, it already indicated that two signatures were required, and that one of them had to be Schoenfelder's. Silvert did not indicate to Hall who the other signatories on the card were, what relationship they had with Apex, or why Schoenfelder had to be one of the signatories. Hall's affidavit also stated in part:

> I did not speak with either Mr. Schoenfelder or Mr. Rawn at any time prior to the account being opened or any time before October, 1986.
>
> I have not learned that either gentleman contacted anyone at the branch before the end of September, 1986, for any purpose.

The Bank sent monthly bank statements and cancelled checks to Apex at its business address. It was never directed to send the statements or cancelled checks to anyone other than Apex.

On or about April 29, 1986, the Bank paid a check in the amount of $67,380 from this account. When the check was signed by Schoenfelder, the payee named was "Marschaun Construction & Development, Inc." Before the check was paid, the name of the payee was changed to "Apex Development Corp./Morning Glory Acct.,"[5] allegedly by Silvert. Subsequently, on May 29, June 3, June 11, and June 19, 1986, four checks totalling $81,000 payable to Apex were paid from the account. Each check contained Silvert's signature and the forged signa-

---

**2.** *See* Appendix A.

**3.** *See* Appendix B.

**4.** Although the signature card reflected an opening deposit of $138,000, the parties apparently agree that the initial account balance was $148,036.21.

**5.** It appears that the "Morning Glory Account" was a separate checking account in the name of Apex on which Silvert could draw without obtaining Schoenfelder's signature.

ture of Schoenfelder. Payment of these checks was reflected on Apex's statement covering the period of May 28 through June 25, 1986.

Through the summer of 1986, Schoenfelder believed that only the check payable to Marschaun Construction had been drawn on the account. In September 1986, Schoenfelder asked Rawn to confirm that the construction loan proceeds were in place. Rawn called the Bank and was informed that the account balance was $134.07. At Schoenfelder's request, the Bank provided him with copies of the statements, cancelled checks, and other records pertaining to the account. When he reviewed them, he discovered that the four checks totalling $81,000 had been cashed within a single statement period over his forged signature. Schoenfelder supplied the Bank with affidavits of forgery and demanded that it recredit the amount of the checks to the account. The Bank refused to do so.

On December 15, 1986, Schoenfelder commenced this action against the Bank, alleging that the Bank had paid checks totalling $81,000 from the account over his forged signature and was required to recredit the account in that amount. By stipulation of the parties, Schoenfelder filed an amended complaint adding an allegation that the Bank had also paid a check on the account on which the payee's identity had been altered.[6] The Bank filed an amended answer and a third-party complaint against Silvert, Silvert's wife, and Apex.

Schoenfelder filed a motion for partial summary judgment, seeking an order requiring the Bank to recredit the account in the amount of the $81,000 paid on the forged checks. The Bank filed a response and cross-motion for summary judgment. On July 13, 1987, the trial court entered a minute entry granting Schoenfelder's motion for partial summary judgment and subsequently entered a formal order which conformed to the minute entry.

The Bank timely filed a motion for reconsideration or alternatively for a new trial, which the trial court denied by minute entry on September 29, 1987. On November 13, 1987, the Bank lodged with the trial court a formal order denying its motion for reconsideration. On November 17, 1987, the trial court issued a minute entry indicating that the trial judge had signed the formal order on that date. The formal order signed by the trial judge was file-stamped by the Maricopa County Superior Court Clerk's office on November 18, 1987. The Bank filed a notice of appeal on December 18, 1987.

## TIMELINESS OF THE NOTICE OF APPEAL

Schoenfelder moved in this court to dismiss the Bank's appeal as untimely. Department B denied the motion, noting "the record plainly indicates that the order appealed from was filed with the clerk of the superior court on November 18, 1987." In his answering brief, Schoenfelder again argues that this court lacks jurisdiction because the notice of appeal was not timely filed. We disagree and reaffirm that the trial court's formal order denying the Bank's motion for reconsideration was not "entered" until November 18, 1987, the date on which the formal order was file-stamped by the clerk of the superior court.

Schoenfelder relies on *Focal Point, Inc. v. Court of Appeals*, 149 Ariz. 128, 717 P.2d 432 (1986) to argue that the date on which the formal order was "entered" was the date on which it was physically placed in the hands of the clerk, November 17, 1987. However, in *Focal Point*, the order from which the appeal was taken was a signed minute entry order which, unlike a formal judgment or order, is not "filed" with the clerk. "Formal judgments ... are filed and dated from the filing date." 149 Ariz. at 129, 717 P.2d at 433. In this case, the signed formal order was filed on November 18, 1987, and thus the Bank's notice of appeal filed December 18, 1987 was timely. Rules 9(a) and (b), Arizona Rules of Civil Appellate Procedure.

---

**6.** Schoenfelder's additional claim concerning the altered check was not the subject of the judgment from which the Bank has taken this appeal.

## SCHOENFELDER'S STANDING AS A "CUSTOMER" OF THE BANK

The Bank argues that Schoenfelder is not a "customer" of the Bank under A.R.S. § 47–4401(A) [7] and therefore lacks standing to bring an action to compel the Bank to recredit Apex's account. A.R.S. § 47–4401(A) provides:

As against its *customer*, a bank may charge against his account any item which is otherwise *properly payable* from that account even though the charge creates an overdraft.

(emphasis added). A.R.S. § 47–4104(A)(5) [8] defines "customer" as:

... any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank.

A check bearing a forged drawer's signature is not "properly payable," and accordingly the customer can demand that the drawee bank recredit the account when it pays such a check. *Cumis Ins. Society, Inc. v. Girard Bank*, 522 F.Supp. 414 (E.D. Penn.1981); *Medford Irrigation District v. Western Bank*, 66 Or.App. 589, 676 P.2d 329 (1984); White and Summers, 1 *Uniform Commercial Code* § 18–3 (3d ed. 1988). These principles are not in dispute.

The disputed issue is whether Schoenfelder is the Bank's "customer" so as to be entitled to bring an action demanding that the account be recredited. Although the case law in this area is sparse, we believe the better reasoned cases support a conclusion that, under the facts of this case, Schoenfelder is not a customer of the Bank, and thus has no standing to seek recrediting of the account.

Similar facts were before the court in *Loucks v. Albuquerque National Bank*, 76 N.M. 735, 418 P.2d 191 (1966). In that case, the court held that the individual partners who had opened a partnership account at defendant bank were not the bank's customers, and therefore could not bring an action against the bank for wrongful dishonor of partnership checks.[9] Rather, the partnership was the customer to whom the bank was liable for the wrongful dishonor. 76 N.M. at 740–41, 418 P.2d at 196–97.[10]

Schoenfelder urges us to follow the reasoning of cases which appear to interpret the definition of "customer" more broadly than *Loucks*. In *First National Bank of Springdale v. Hobbs*, 248 Ark. 76, 450 S.W.2d 298 (1970), Hobbs (president of S & H, Inc., the lessor of a Holiday Inn Motel) and Starnes (the lessee) opened an account at defendant bank in the name of "Holiday Inn—Operating Account." Hobbs and Starnes spoke personally with the bank's president, Robert Moore.[11] Hobbs told Moore that he and Starnes had entered into a lease agreement, that they were opening the account, and that they wanted to structure the account so that only Hobbs, Starnes, and Hobbs' son-in-law would be authorized signatories on the account. Through bank error, Starnes' wife also signed the signature card. The bank paid out a substantial amount on six checks cosigned by Mrs. Starnes. Hobbs sued the bank to recredit the account, and S & H, Inc. later intervened. 450 S.W.2d at 300–01.

---

7. Uniform Commercial Code (U.C.C.) § 4–401(1).

8. U.C.C. § 4–104(1)(e).

9. U.C.C. § 4–402 (A.R.S. § 47–4402) governs a payor bank's liability to its "customer" for wrongful dishonor. Schoenfelder attempts to distinguish *Loucks* and other cases cited by the Bank on the basis that the status of a "customer" in an action for wrongful dishonor under § 4–402 is somehow different than the status of a "customer" in an action on a check not properly paid under § 4–401. We find this to be a distinction without a difference. We note that Schoenfelder himself relies on wrongful dishonor cases when their analysis of "customer" is favorable to him. *E.g., Murdaugh Volkswagen, Inc. v. First National Bank of South Carolina*, 801 F.2d 719 (4th Cir.1986).

10. The *Loucks* holding is even more persuasive in our opinion because the signatures of the individual partners were required in order to withdraw money from the account. 76 N.M. at 737, 418 P.2d at 193.

11. Moore apparently already knew Hobbs, but had never before met Starnes. 450 S.W.2d at 300.

The bank alleged that neither Hobbs nor S & H, Inc. was a customer of the bank under U.C.C. § 4–104. The court noted that the account was not carried in the name of either an individual or a corporation, and that Hobbs was the "customer" who opened the account and directed the manner in which it was handled. 450 S.W.2d at 301.

In our opinion, *Hobbs* and the other cases on which Schoenfelder relies to establish his standing as a "customer" are inapposite. In *Hobbs*, the bank's president was personally aware that Hobbs was the person mainly interested in setting up the account. He testified that he assumed Hobbs and Starnes owned the account. 450 S.W.2d at 301. Similarly, in *Kendall Yacht Corp. v. United California Bank*, 50 Cal.App.3d 949, 123 Cal.Rptr. 848 (4th Dist.1975), the evidence indicated that the Kendalls (officers and principal shareholders of a corporation which never issued stock and was undercapitalized) were as much "customers" of defendant bank as was the corporation in whose name the account was opened. In *Kendall*, the court found that the corporation was a "transparent shell," controlled and financed solely by the Kendalls, and that the bank *knew* this was the case. The bank looked directly to the Kendalls to satisfy the corporation's debts, and even required them to execute personal guarantees to cover credit extended to the corporation for corporate overdrafts. Thus, the Kendalls themselves could recover for wrongful dishonor of the corporation's checks. *Id.* at 956, 123 Cal. Rptr. at 853. *Cf. Murdaugh Volkswagen, Inc. v. First National Bank of South Carolina*, 801 F.2d 719, 725 (4th Cir.1986) (bank clearly treated president and sole stockholder of corporate depositor as the bank's customer and repeatedly looked to her to assume corporation's obligations).

The record in this case does not establish that the Bank regarded Schoenfelder as its customer. Before opening the account in issue, Schoenfelder and Silvert spoke by telephone with a Bank employee at the 16th Street & Morten branch. Schoenfelder stated in his affidavit:

> We discussed the requirement that my written approval would be required for all disbursements in accordance with my agreement with Silvert that all funds would be used for the development of the land on which I held a secured position. It was The Arizona Bank's suggestion that the account be structured as a two signature account. It was to be a signatory, my controller, D.W. Rawn, was to be a signatory and D. Robert Silvert was to be a signatory. It was also determined that two signatures would be required, and one must be mine. I was assured by The Arizona Bank that under this arrangement, funds could not be disbursed without my signature.

Communication between Schoenfelder and the Bank regarding the account ended with this telephone call. Silvert then went alone to the Bank, procured the signature card, and proceeded to open the account in Apex's name. There is no evidence that Silvert ever communicated to the Bank that the account he was opening was in any way related to a prior telephone conversation with the Bank employee, much less in reliance on it. *Cf. Farmers Bank v. Sinwellan Corp.*, 367 A.2d 180, 183 (Del.1976).

We agree that the account did in fact conform to the Bank employee's advice on how to structure it so that Schoenfelder would have mandatory approval of disbursements. However, we do not agree that this compels the conclusion that the Bank agreed to treat Schoenfelder as its customer. There is no evidence that, *at the time the account was actually opened or at any time thereafter*, the Bank was aware that Schoenfelder's relationship with it was anything more than a mandatory signatory on a corporate account. Undoubtedly many corporate accounts are opened in bank branches on which a person, often an officer or trusted employee of the corporation, is named a mandatory signatory. A mandatory signatory on a corporate account does not thereby become a customer under A.R.S. §§ 47–4104 and 47–4401. We hold that the evidence in this

case is insufficient to establish that Schoenfelder was the Bank's customer under A.R.S. § 47–4401(A). Thus, Schoenfelder has no standing to bring this action.[12]

The trial court's order is reversed and remanded with instructions to enter summary judgment in favor of the Bank.

JACOBSON, P.J., and BROOKS, J., concur.

APPENDIX A

12. We reject Schoenfelder's argument that he has standing by virtue of his signature acknowledging receipt of a "Depositor's Agreement." The trial court's order that the Bank recredit the account is a remedy governed by the U.C.C. We do not believe that this provision of the signature card constituted an agreement of the parties to vary the effect of the U.C.C. provisions. A.R.S. § 47–1102(C).

## APPENDIX B

| SUPERSEDES CARD DATED | SUPERSEDED BY CARD | O D. AMOUNT (DDA) | DATE CARD REC'D 4-30-86 |
|---|---|---|---|

SERVICING BRANCH __16th & Morten__ 8 ___

**The Arizona** BANK

000014

OWNERSHIP
☐ INDIVIDUAL (ONE PERSON)
☐ JOINT TENANTS
☐ COMMUNITY PROPERTY
☐ TENANTS IN COMMON
☐ LODGE/ASSOC NON PROFIT
☐ PROPRIETORSHIP
☐ PARTNERSHIP
☒ CORPORATION
☐ FIDUCIARY ACCOUNT

| Acct Type | ACCOUNT NO | OPENING DEPOSIT | DATE OPENED | OPENED BY | APPVD BY | DATE C/S/T |
|---|---|---|---|---|---|---|
| PMK | 088-160999 | $138,000. | 4-28-86 | W Hall | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

TWO SIGNATURES REQUIRED

ACCOUNT NAME

**APEX DEVELOPMENT CORP**

WHEN YOU SIGN BELOW, YOU ACKNOWLEDGE RECEIPT OF THE DEPOSITORS AGREEMENT, ELECTRONIC FUNDS TRANSFER DISCLOSURE, SERVICE CHANGE BROCHURE AND IF A TIME DEPOSIT ACCOUNT IS OPENED, THE DEPOSITORS AGREEMENT SUPPLEMENT A-TIME DEPOSITS. YOU AGREE YOUR ACCOUNT(S) WILL BE GOVERNED BY THE AGREEMENTS AND THE AGREEMENTS CONSTITUTE YOUR CONTRACT WITH THE BANK

86-0532922
EMPLOYER'S ID #

☒ CHECK HERE IF TWO SIGNATURES ARE REQUIRED    ☐ CHECK HERE IF ADDITIONAL SIGNERS ON SEPARATE CARD    ☐ BENEFICIARY NAMED ON BACK OF CARD

SIGNATURES

I must be G. P. Schoenfelder

SOCIAL SECURITY #

G.P. SCHOENFELDER    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

D.W. RAWN    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

ROBERT SILVERTS

07026000(Rev. 1-86)    Original - Branch File Copy    Duplicate - CCF Copy    Triplicate - Temporary Copy

OVER

BENEFICIARY OR POD DESIGNATION

| NAME | SOCIAL SECURITY NUMBER |
| ADDRESS | |
| CITY | STATE | ZIP |

| NAME | SOCIAL SECURITY NUMBER |
| ADDRESS | |
| CITY | STATE | ZIP |

FORMER BANK ACCOUNT OR REFERENCE

IDENTIFICATION

000015

FEDERAL TAX REGULATIONS UNDER THE INTEREST AND DIVIDEND TAX COMPLIANCE ACT REQUIRE THE FOLLOWING TO BE COMPLETED TO AVOID BACKUP WITHHOLDING

CHECK APPLICABLE BOXES
☒ THE NUMBER SHOWN ON THIS FORM IS MY CORRECT U S TAXPAYER IDENTIFICATION NUMBER
AND
I AM NOT SUBJECT TO BACKUP WITHHOLDING EITHER BECAUSE
☒ (1) I HAVE NOT BEEN NOTIFIED THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF FAILURE TO REPORT ALL INTEREST AND DIVIDENDS, OR
☐ (2) THE INTERNAL REVENUE SERVICE HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING.

CERTIFICATION: UNDER PENALTIES OF PERJURY, I CERTIFY THAT THE INFORMATION I HAVE PROVIDED ON THIS FORM IS TRUE, CORRECT AND COMPLETE

SIGNATURE _____ DATE 4/25/86
SIGNATURE _____ DATE 4/25/86
SIGNATURE _____ DATE _____
SIGNATURE _____ DATE _____