796 P.2d 881

**G.P. SCHOENFELDER, an individual, Plaintiff–Appellee,**

v.

**ARIZONA BANK, an Arizona corporation, Defendant–Appellant.**

No. CV–89–0215–PR.

Supreme Court of Arizona, En Banc.

July 17, 1990.

Reconsideration Denied Sept. 18, 1990.

Carson Messinger Elliott Laughlin & Ragan by Michael J. Pearce and Michael P. Anthony, Phoenix, for plaintiff-appellee.

Jennings, Strouss & Salmon by Maurice Portley, Rick N. Bryson and James M. Ackerman, Phoenix, for defendant-appellant.

## OPINION

CORCORAN, Justice.

This case requires us to decide which of two seemingly innocent parties should bear the loss caused by the apparent fraud of a third person in passing forged checks. The plaintiff, G.P. Schoenfelder, a mandatory signatory on the account on which the checks were forged, seeks review of the court of appeals decision holding that he was not a "customer" entitled to seek recredit of the account from the bank that accepted the forged checks, and directing entry of summary judgment for the bank. Defendant Arizona Bank (Bank) raises a cross-issue not addressed by the court of appeals because of its conclusion that Schoenfelder was not a customer.

We accepted review of two issues, the first raised by Schoenfelder's petition for review and the second raised as a cross-issue by the Bank:

1. Does a person who executes a bank's "depositor's agreement" signature card and who is the only mandatory signatory on the account, although his name differs from the account name, have standing as a "customer" of the bank to seek recredit of the account for wrongful disbursement after the bank accepted checks forged with his name?

2. If such a person is a "customer," did his failure to fulfill the statutory duties of a customer provide the bank with an affirmative defense that would preclude summary judgment in the customer's favor?

We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. § 12–120.24.

*Factual and Procedural Background*

The facts of this case are described in some detail in *Schoenfelder v. Arizona*

*Bank,* 161 Ariz. 601, 780 P.2d 434 (App. 1989), and we summarize them only briefly here. In April 1986 Schoenfelder was arranging to sell a 4–acre parcel of land to a developer, Apex Development Corporation, whose president was Robert Silvert. Apex planned to finance development of the parcel with a construction loan, and Schoenfelder wanted assurance that the loan proceeds would be properly applied to the property, in which he had a secured interest. Silvert and Schoenfelder agreed to open an account at the Arizona Bank, where Apex had two other accounts. After speaking by phone to a Bank employee, they structured the new account so that Schoenfelder's signature would be required for any withdrawal. The account was opened in the name of "Apex Development Corp." and Silvert deposited the construction funds into the account. The depositor's signature card named Schoenfelder, Silvert, and D.W. Rawn, Schoenfelder's controller, as signatories on the account. The card indicated that two of the three signatures were necessary for withdrawals and that *one of them* "must be G.P. Schoenfelder." *Schoenfelder,* 161 Ariz. at 608–09, 780 P.2d at 441–42 (Appendix B). From April through August 1986 the Bank sent monthly statements to Apex at its business address, but did not send statements to Schoenfelder.

The first check Schoenfelder signed was payable to "Marschaun Construction & Development, Inc." However, before the check was paid, Silvert allegedly altered the name of the payee to "Apex Development Corp./Morning Glory Account." The Bank paid this check on April 29, 1986. The "Morning Glory Account" apparently was another Apex account at the same bank from which Silvert could draw funds without Schoenfelder's signature.

Between May 29 and June 19, the Bank paid 4 checks totalling $81,000 that bore Schoenfelder's forged signature. Payment of all 4 checks appeared on a single Bank statement reflecting transactions on the account between May 28 and June 25. Schoenfelder did not learn of the forgeries until he checked with the Bank in September to determine if the construction funds were still intact. At that time he discovered the account balance was only $134.07. He then requested copies of the bank statements and cancelled checks, which the Bank sent him. When he discovered the forgeries, he filed affidavits of forgery and demanded that the Bank recredit the account for the amounts paid on the forged checks. The Bank refused, and Schoenfelder brought this action, alleging breach of contract and breach of fiduciary duty by the Bank.

Schoenfelder's complaint initially sought only to recredit the $81,000 paid on the 4 forged checks. He later amended his complaint to add a claim to recredit the April check on which the payee had been altered after he signed it. That amended claim is not at issue in this review. The Bank subsequently filed an amended answer and a third-party complaint against Silvert, Silvert's wife, and Apex. Those claims are also not at issue here.

The trial court granted Schoenfelder's motion for partial summary judgment, denied the Bank's cross-motion raising its defense, and ordered the Bank to recredit the Apex account for the $81,000 in forged checks. The Bank timely appealed,[1] and the court of appeals reversed. The court of appeals directed the trial court to grant the Bank's cross-motion for summary judgment, on the ground that Schoenfelder was not a "customer" with standing to sue the Bank to recredit the amount of the forged checks. Because of its disposition on this threshold issue, the court of appeals did not address the remaining issue raised on appeal—whether, if a customer of the Bank, Schoenfelder was precluded from suing the Bank because he breached the statutory duties of a customer.

### Discussion

1. *Was Schoenfelder a "Customer" of the Bank?*

 ▉ The parties agree that the Uniform Commercial Code (UCC), which has

---

1. We approve, without discussing, the holding of the court of appeals that the Bank's appeal was timely filed. *See Schoenfelder,* 161 Ariz. at 604, 780 P.2d at 437.

been substantially adopted in Arizona,[2] governs the banking transactions involved in this case. *See* A.R.S. §§ 47–4101 to –4504. The relevant statute defines "customer" as follows:

> ... any person having an account with a bank or for whom a bank has agreed to collect items and includes a bank carrying an account with another bank.

A.R.S. § 47–4104(A)(5). A customer of a bank can bring an action to require the bank to recredit the account for the wrongful disbursement of a forged check.[3] *Wilder Binding Co. v. Oak Park Trust and Sav. Bank*, 135 Ill.2d 121, 142 Ill.Dec. 192, 552 N.E.2d 783 (1990); *see generally* 1 White & Summers, *Uniform Commercial Code* § 18–3 (3d ed.1988).

█ In reversing the trial court's grant of partial summary judgment in favor of Schoenfelder, the court of appeals concluded:

> Although the case law in this area is sparse, we believe the better reasoned cases support a conclusion that, under the facts of this case, Schoenfelder is not a customer of the Bank, and thus has no standing to seek recrediting of the account.

161 Ariz. at 605, 780 P.2d at 438. The court of appeals relied on a line of cases cited by the Bank for the proposition that the *entity* named as owner on the account, rather than its individual officers or agents as signatories, is the true "customer" in the absence of a bank's knowledge of any agreement that the signatories have a beneficial interest in the account. *See Loucks v. Albuquerque Nat'l Bank*, 76 N.M. 735, 418 P.2d 191 (1966) (individual partners who opened a partnership account were not "customers" who could sue the bank for wrongful dishonor of a partnership check); *Farmers Bank v. Sinwellan Corp.*, 367 A.2d 180 (Del.1976) (corporate president was not "customer" who could sue for wrongful dishonor of corporate check). *See also Kesner v. Liberty Bank*, 7 Mass. App. 934, 390 N.E.2d 259 (1979) (corporate treasurer was not "customer" who could sue for damages for wrongful dishonor of corporate check); *Koger v. East First Nat'l Bank*, 443 So.2d 141 (Fla.App.1983) (principal stockholder could not bring action against bank for wrongful dishonor of corporate check); *Thrash v. Georgia State Bank*, 189 Ga.App. 21, 375 S.E.2d 112, 113 (1988) (officer and shareholder of a corporation was not a "customer" with standing to sue for wrongful dishonor of corporate checks).[4]

**2.** Arizona adopted the 1972 version of the Uniform Commercial Code in Laws 1975, ch. 65, and subsequently renumbered its version in Laws 1984, ch. 77, to conform to the UCC numbering system. *See generally Prairie State Bank v. IRS*, 155 Ariz. 219, 220 n. 1, 745 P.2d 966, 967 n. 1 (App.1987).

**3.** We note that the court of appeals analyzed the meaning of the word "customer" within the context of A.R.S. § 47–4401(A), which provides:

> As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft.

This statute immunizes a bank from liability for payment of a properly drawn *overdraft*, and is not applicable to this case, because the forgeries did not result in an overdraft on the Apex account.

**4.** Schoenfelder attempts to distinguish these cases cited by the Bank because they all involved wrongful dishonor of a check rather than payment of an unauthorized check. We agree with the court of appeals that this is "a distinction without a difference." *Schoenfelder*, 161 Ariz. at 605 n. 9, 780 P.2d at 438 n. 9. A

bank is liable for wrongful dishonor under U.C.C. § 4–402 (A.R.S. § 47–4402), which may involve consequential damages, and liable for a check not properly payable under U.C.C. § 4–401 (A.R.S. § 47–4401), which involves a recredit to the account. However, the status of the relationship between a bank and its "customer" is not affected by which of these two liabilities is alleged. Furthermore, as the court of appeals noted, Schoenfelder relies on wrongful dishonor cases when the result is favorable to his position. *See, e.g., Murdaugh Volkswagen, Inc. v. First Nat'l Bank*, 801 F.2d 719 (4th Cir.1986).

For clarification, however, we note that this case involves not only the Bank's payment of an unauthorized check, but also a breach of the contractual agreement between Schoenfelder and the Bank. These circumstances are stronger than when a mere signatory seeks personal recovery of consequential damages for wrongful dishonor of a check on an account owned by a business entity. We also note that the issue here is not the technical ownership of the funds involved, but whether Schoenfelder has *standing* as a customer to assert the rights of the corporate owner, Apex, to have the account re-

In this case, the court of appeals reasoned:

There is no evidence that, *at the time the account was actually opened or at any time thereafter*, the Bank was aware that Schoenfelder's relationship with it was anything more than a mandatory signatory on a corporate account. Undoubtedly many corporate accounts are opened in bank branches on which a person, often an officer or trusted employee of the corporation, is named a mandatory signatory. A mandatory signatory on a corporate account does not thereby become a customer under A.R.S. §§ 47–4104 and 47–4401. We hold that the evidence in this case is insufficient to establish that Schoenfelder was the Bank's customer under A.R.S. § 47–4401(A). Thus, Schoenfelder has no standing to bring this action.

161 Ariz. at 606–07, 780 P.2d at 439–40.

We disagree that the narrow rule articulated in the *Loucks* line of cases should be applied to the specific facts of this case. Indeed, the facts of those cases are clearly distinguishable. In *Loucks*, the court found that the plaintiff was not even a "depositor." 418 P.2d at 197. In *Kesner*, the court pointed out that "there is no ambiguity here as to who had the account with the bank," nor was there any allegation that the corporate entity was "in effect, nothing but a transparent shell." 390 N.E.2d at 259. In *Koger*, the court noted that although the stockholder had a relationship with the corporate customer, he had no relationship with the bank as a depositor, as a signatory, or otherwise. 443 So.2d at 142. In none of these cases did the banks have knowledge of a unique arrangement between the plaintiff and the named account owner regarding ownership of the funds.

In our view, a more appropriate interpretation of "customer" under the facts of this case takes into account all the material circumstances surrounding the opening of the account, the acknowledged intent of the parties to the transaction, the bank's knowledge of that intent, and the nature of the bank's transactions with the parties. One such case, cited by Schoenfelder, is *First Nat'l Bank v. Hobbs*, 248 Ark. 76, 450 S.W.2d 298 (1970). In that case, Hobbs, the president of a corporation who was the lessor of a Holiday Inn Motel, and Starnes, the lessee, opened a bank account in the name of "Holiday Inn–Operating Account." The purpose was to ensure that Starnes would apply the account funds only to motel operating expenses. Hobbs and Starnes spoke with the bank's president and informed him of their lease agreement and that they wanted to structure the account so that Hobbs, Starnes, and Hobbs' son-in-law would be signatories on the account, and that two signatures would be required for any check. Through bank error, Starnes' wife also signed the signature card and the bank paid on 6 checks cosigned by Mrs. Starnes. When Hobbs sued the bank to recredit the account, the bank alleged that Hobbs was not its "customer" under the UCC definition. The court rejected this contention, noting that the bank knew the circumstances surrounding the opening of the account, and had acknowledged Hobbs' interest in the account.[5] Viewing the entire transaction and the bank's knowledge, the court found that both Hobbs and Starnes were "customers" of the bank within the meaning of the UCC. *See also Murdaugh Volkswagen, Inc. v. First Nat'l Bank*, 801 F.2d 719 (4th Cir.1986) (president and sole stockholder of corporation was "customer" who could bring action for wrongful dishonor of check on corporate account because bank treated her as its depositor and customer); *Kendall Yacht Corp. v. United Cal. Bank*, 50 Cal.App.3d 949, 123 Cal.Rptr. 848 (1975) (court rejected the "narrow and technical

credited because of Schoenfelder's contractual relationship with the Bank. To that extent, we find the cases that involve wrongful dishonor distinguishable.

5. The court also noted that the account was not opened in the name of either the individuals or

the corporation, but was entitled "Holiday Inn–Operating Account." Thus, the name of the account was not dispositive in the determination of who was the bank's "customer." *Hobbs*, 450 S.W.2d at 301.

reading" of the word "customer" by the *Loucks* court and held that where bank had knowledge that individual signatories controlled the financial affairs of an undercapitalized corporate entity, the individuals were the bank's "customers" who could bring action for wrongful dishonor of checks on the corporate account).

We also find instructive the reasoning of the Illinois appellate court in *Menerey v. Citizens First Nat'l Bank*, 160 Ill.App.3d 223, 112 Ill.Dec. 139, 513 N.E.2d 553 (1987). In that case, Howard Hamm deposited more than $5,000 into a savings account opened in the name of an individual child, Crystal Hamm. The signature card indicated that two adult signatures were required to authorize a withdrawal from the account, including Howard Hamm's. When Howard Hamm died, the other adult signatory withdrew the funds on her own signature, and the executrix of Howard Hamm's estate brought an action against the bank for return of the funds to the account. The trial court granted the bank's motion to dismiss, stating that neither the signatories nor the estate had standing to complain that the bank had paid funds on improper signatures; the trial court reasoned that only the minor child named as owner of the account had such standing. The appellate court reversed, relying on the nature of the contractual relationship between the bank and its depositor:

> A contract arises by implication of law from a general deposit of funds in a bank that the bank will, whenever *properly* demanded, pay the funds in such sums and to such persons as the depositor shall direct and designate.... A high standard of contractual responsibility has been imposed on banks in paying money chargeable against their depositors' accounts. The bank must, in paying out a deposit, comply with its agreement with the depositor....

The facts of this case indicate that that rule was not followed. The signature card clearly required two signatures.... The release of the funds on only one signature was a breach of the contract between Howard Hamm and the Bank,

and, as such, Howard would have had a valid cause of action against the Bank were he still alive.

*Menerey*, 112 Ill.Dec. at 140, 513 N.E.2d at 554. Thus, the estate of the mandatory signatory also had standing to seek return of the funds from the bank, even though the mandatory signatory was not a named owner of the account. *See also American Nat'l Bank v. Stanfill*, 205 Cal.App.3d 1089, 1100, 252 Cal.Rptr. 861, 867 (1988) (individuals raised an arguable factual issue, precluding summary judgment, about whether they were "customers" entitled to raise a defense of offset for losses resulting from corporate account, because "it was entirely foreseeable that appellants would suffer adverse consequences if the ... account was not managed according to instructions").

■ In determining who is a "customer" of the bank, the broader reasoning of these latter cases focuses on the relationship of the parties to the bank, the purpose of the account, and the bank's knowledge of those facts, rather than on the mere technicalities of the named owner of the account, and the formal organization of that entity. We believe this more fact-intensive analysis is appropriate in determining who is a "customer" of the bank. With that reasoning in mind, we examine the evidence available to the trial court at the time it ruled on Schoenfelder's motion for partial summary judgment, viewing it in the light most favorable to the Bank, as the party opposing the motion.

■ In his complaint, Schoenfelder alleged the following facts surrounding the opening of the account:

> The Arizona Bank was informed that this account was being opened as part of an escrow agreement between G.P. Schoenfelder and Apex Development Corp., which is owned and controlled by Robert Silvert. The Bank was further informed that the Bank must not permit any monies to be withdrawn or expended from this account except with the written signatures of two of the following persons: G.P. Schoenfelder, D.W. Rawn and Rob-

ert Silvert. The Bank was also informed that one of the signatures must always be that of G.P. Schoenfelder.

In support of his motion for partial summary judgment, Schoenfelder filed his own affidavit relating the circumstances surrounding the opening of that account:

In April of 1986, I was about to close escrow on a transaction with D. Robert Silvert whereby Silvert's corporation, Apex Development Corp., was going to purchase from me and develop a four acre parcel of land. Funding for the development was coming from a construction and development loan which was secured by a lien on the four acre parcel, and I wanted to ensure that all disbursements from that fund were properly applied to develop the land. After discussions on the matter, Silvert and I agreed that the funds would be placed in the 16th Street and Morten branch of the Arizona Bank in an account from which funds could only be drawn with my written authorization. In order to finalize the transaction, Silvert and I met at the offices of Transamerica Title with the Escrow Agent, Jeanne Murphy. We discussed the bank account and decided to call the Bank to obtain advice on how the account should be structured so that I would have mandatory approval of all disbursements.

In the offices of Transamerica Title, Silvert and I called the Bank and took turns speaking on the phone. *I am not sure who we spoke to at the 16th Street and Morten branch, but I believe it was either Wilma Hall or Gail Allen.* We discussed the requirement that my written approval would be required for all disbursements in accordance with my agreement with Silvert that all funds would be used for the development of the land on which I held a secured position. *It was also determined that two signatures would be required and one must be mine. I was assured by the Bank that under this arrangement, funds could not be disbursed without my signature.* The Bank did not ask for my address to send statements to, nor did they advise me that I would be required to receive and examine statements.

(Emphasis added.)

In the trial court, the *only* evidence introduced by the Bank to refute Schoenfelder's version of the Bank's knowledge of his beneficial interest in the account was an affidavit by a Bank employee, Wilma Hall, who testified as follows:

Mr. Silvert came into the branch ... on April 28, 1986, and secured a signature card and opened the account. I provided Mr. Silvert with the signature card.... Mr. Silvert did not indicate why Apex Development Corp. was opening another account.... Mr. Silvert returned the signature card to this branch on April 30, 1986. The signature card indicated that two signatures were required and one had to be Mr. G.P. Schoenfelder. Mr. Silvert did not indicate who the other signatories were or what relationship they had with the corporation, or why Mr. Schoenfelder had to be one of the signatories.... *I did not speak with either Mr. Schoenfelder or Mr. Rawn at any time prior to the account being opened or at any time before October, 1986.... I have not learned that either gentleman contacted anyone at the branch before the end of September, 1986, for any purpose....* Mr. Silvert did not produce any documents which indicated why the account was opened or what the funds were to be used for.

(Emphasis added).

Solely on the basis of this affidavit, the Bank argued that Schoenfelder was not a customer with standing to seek to recredit the account. In its response and cross-motion, the Bank reasoned:

The fact that Plaintiff alleges he has some agreement with Mr. Silvert and/or Apex Development Corp. and was a mandatory signatory to the ... account does not raise his status from signatory to customer/depositor. *Mr. Silvert and Apex did not advise the Arizona Bank that they had any agreement which was to affect the status of the account.*

(Emphasis added.)

We believe that, on the basis of this record, the court of appeals erred in find-

ing that "there is no evidence" that the Bank was aware that Schoenfelder's relationship was more than simply a mandatory signatory on a corporate account. We do not agree with the court of appeals that Wilma Hall's affidavit established as a matter of law that the Bank was ignorant of Schoenfelder's relationship to the account. Hall's affidavit merely establishes that she personally did not discuss the structuring of the account with Silvert and Schoenfelder. The affidavit does not refute, for example, Schoenfelder's sworn statement that the conversation occurred with Gail Allen or another Bank employee.

Furthermore, we do not agree with the Bank that Hall's affidavit raises even a disputed issue of fact about whether such a conversation ever occurred. The Bank did not identify Hall's position or the scope of her supervisory responsibilities; her lack of personal knowledge about the existence of such a conversation with another Bank employee does not support even an inference that the discussion about which Schoenfelder testified did not occur. On this factual record, we find that the Bank has simply not raised a disputed issue of fact about its awareness of the purpose of the account and Schoenfelder's relationship to the funds deposited in that account.

Additionally, Schoenfelder produced further evidence that establishes the Bank's knowledge of his relationship to the account. For example, the written signature card gave explicit limiting instructions for withdrawals from the account that identically matched what Silvert, Schoenfelder, and the Bank had agreed to in the phone conversation. Furthermore, although the Bank now denies that Schoenfelder was a "customer," it treated him as a customer when he called in September 1986 to check on the account balance. The Bank immediately complied with Schoenfelder's request to send him copies of the statements and cancelled checks. We believe the Bank's conduct surrounding the transactions on this account indicates that the Bank was aware of Schoenfelder's beneficial interest in the account. On this record, we hold that the trial court was correct in determining that Schoenfelder was a "customer" of

the Bank with standing to maintain this action, and that the court of appeals erred in vacating that order and granting summary judgment in favor of the Bank.

## 2. *Did Schoenfelder Fail to Fulfill the Statutory Duties of a Customer?*

As a cross-issue in its response to the petition for review, the Bank asks us to address whether Schoenfelder should be precluded from summary judgment because he failed to meet the statutory duties of a "customer." The trial court implicitly resolved this issue by granting summary judgment in favor of Schoenfelder, but the court of appeals did not address it because of its threshold determination that Schoenfelder was not a customer. This issue has been properly preserved for review pursuant to rule 23(i)(3), Arizona Rules of Civil Appellate Procedure. Although we could remand this matter to the court of appeals for determination of the cross-issue in view of our reversal of its previous holding, *see* rule 23, we will, in our discretion, address the issue in the interest of judicial economy.

 The rule is well established that a bank is strictly liable to its customer for payment of forged checks unless it raises and establishes an affirmative defense that would preclude the customer from asserting the unauthorized signature. *See generally* 2A Hart & Willier, *Bender's Uniform Commercial Code Service* § 14.11[1] at 14–62 (1990); *Cumis Ins. Soc'y, Inc. v. Girard Bank,* 522 F.Supp. 414 (E.D.Pa. 1981). Whether a customer is precluded by such a defense is usually a question of fact not appropriately decided by summary judgment, because this issue generally involves a determination of what constitutes reasonable care and promptness on the part of the customer and what constitutes reasonable care and commercial reasonableness on the part of the bank. *See Exchange Bank v. Kidwell Constr. Co.,* 472 S.W.2d 117 (Tex.1971); *see generally K & K Mf'g, Inc. v. Union Bank,* 129 Ariz. 7, 628 P.2d 44 (App.1981).

■ The Bank argued on appeal that, even if Schoenfelder was its customer, the record contains evidence that would raise a triable fact issue about whether the Bank had viable defenses that preclude Schoenfelder's recovery. First, the Bank argued that it had a defense under A.R.S. § 47–3406, which provides:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a ... drawee ... who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

To successfully assert this defense, the Bank must prove that the customer's negligent conduct substantially contributed to the forgery, and must present evidence that it acted in conformity with commercially reasonable banking standards. *First Bank v. Vaccari*, 288 Ark. 233, 703 S.W.2d 867 (1986); *see also* U.C.C. § 3–406, Official Comment, Paragraph 6, 2 U.L.A. 349 (1977).[6]

■ Schoenfelder points out that the Bank did not raise this defense in either its answer or in its response to the motion for partial summary judgment or cross-motion. Our review of the trial court record compels us to agree that the defense of A.R.S. § 47–3406 was not presented to the trial court, but was raised for the first time on appeal. The Bank's only reference to § 47–3406 in the trial court was in the context of a quote from *K & K Mf'g, Inc. v. Union Bank*.[7] The Bank's exclusive defense argument to the trial court was its assertion that Schoenfelder failed to timely examine the monthly bank statements and promptly notify the Bank of the forgeries. This argument, however, was relevant only to the Bank's asserted defense under A.R.S. § 47–4406, discussed *infra*. Furthermore, we find that the Bank presented no evidence in the trial court that Schoenfelder either "substantially contributed" to the actual forgeries, or that the Bank acted in accordance with reasonable commercial standards. As a general rule, we will not review an issue on appeal that was not argued or factually established in the trial court. *Continental Bank v. Wa-Ho Truck Brokerage*, 122 Ariz. 414, 595 P.2d 206 (App.1979). *Cf. Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 482, 724 P.2d 562, 568 (1986) (issue not raised in court of appeals may be addressed on review if raised and fully argued in the trial court); *see also* note 7, *infra*. We therefore hold that, because the Bank failed to properly raise this defense, Schoenfelder was not precluded in the trial court by § 47–3406 from asserting the forgeries against the bank.

The Bank also argued on appeal that it offered sufficient evidence in the trial court to raise a triable issue of fact about whether Schoenfelder was precluded by the Bank's defense under A.R.S. § 47–4406, which provides, in part:

A. When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unau-

---

6. We note that the court of appeals has implied that the *customer* bears the burden of establishing that the bank did not exercise ordinary care and act in accordance with commercially reasonable banking practices in defending against a bank's defense under A.R.S. § 47–3406. *See K & K Mf'g, Inc.*, 129 Ariz. at 11, 628 P.2d at 48. The court cited no authority for that proposition, and the burden of proof was not at issue in that appeal. We therefore reject that reasoning.

7. The minute entry memorializing the hearing on the motions at issue indicates that no court reporter was present, and thus we have no transcript of the arguments made at that hearing; however, the minute entry does not indicate that any new evidence was presented or testimony heard. In the absence of a transcript in the appellate record, we presume that whatever occurred at the hearing supported the trial court's ruling. *Rapp v. Olivo*, 149 Ariz. 325, 718 P.2d 489 (App.1986).

thorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

B. If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection A the customer is precluded from asserting against the bank:

1. His unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

2. An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

C. The preclusion under subsection B does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item or items.

■■■ The Bank did assert this defense in the trial court in its cross-motion for summary judgment, therefore properly raising and preserving it for appellate review. *See Continental Bank*, 122 Ariz. at 417, 595 P.2d at 209 (bank may raise affirmative defense against forgeries in connection with motions for summary judgment even if not pleaded in answer).

■■■ We agree with the Bank that the record indicates factual issues about whether the Bank made monthly statements "reasonably" available to Schoenfelder and about whether Schoenfelder's delay in notifying the Bank of the forgeries constituted "reasonable care" under the circumstances. Normally, such factual issues would preclude summary judgment on this defense. *See, e.g., Flagship Bank v. Complete Interiors, Inc.*, 450 So.2d 337, 340 (Fla.App.1984). Additionally, whether the Bank exercised ordinary care also would be a fact issue normally precluding summary judgment. *See Cook v. Great*

*Western Bank*, 141 Ariz. 80, 685 P.2d 145 (App.1984).

However, in this case, the Bank failed to provide any evidence to establish an essential element of the defense under § 47–4406 that would entitle it to preclude summary judgment in Schoenfelder's favor: namely, the Bank has failed to indicate how Schoenfelder's delay in reviewing the statements and notifying the Bank of the forgeries caused the loss.

■■■ To assert a defense of customer negligence under § 47–4406(B)(1), the Bank must affirmatively establish that the customer's negligence in inspecting the statements or giving notice of the forgeries *caused* the loss. *See* U.C.C. § 4–406(2)(a); *Oak Cliff Bank v. Aetna Casualty & Surety Co.*, 436 S.W.2d 165, 169 (Tex.Civ. App.1968); Comment, *Casualty & Surety Check Forgeries: Variations of Rules of Liability Based on Fault—U.C.C. Defense Sections 3–406 and 4–406*, 12 Ariz.L.Rev. 417, 424 n. 39 (1970) ("A prerequisite to the bank's assertion of these defenses is that the bank show it suffered a loss *by reason of* the customer's failure to notify" (emphasis in original)). Normally, the bank can establish this causation when multiple forgeries by the same wrongdoer occur over a period of time involving several bank statements. The following excerpt from a UCC treatise gives an example of how the defense works:

If a statement and checks that are returned contains an unauthorized signature or material alteration, and if the customer fails to discover this and report it to the bank within a reasonable period not to exceed 14 days, and if the same person who was responsible for the unauthorized signature or alteration once again signs the customer's name without authority to a new check or materially alters a check thereafter, then the customer is precluded from raising the new unauthorized signature or alteration.

Hart & Willier, *supra*, § 14–11[2] at 14–66.

■■■ In this case, the record clearly indicates that all 4 forged checks were paid in one statement period, and appeared in a single monthly bank statement. The Bank

presented no evidence to the trial court that the Bank could have avoided the loss if Schoenfelder had reviewed the statement within 14 days and notified it of the forgeries. Thus, the Bank failed to show evidence of how Schoenfelder's delay in reviewing the June 1986 statement until September 1986 resulted in the loss from the forged checks paid prior to that statement. Under these circumstances, where all forged instruments appeared on the same bank statement, and no further forgeries occurred, we believe that the defense under § 47–4406(B)(2) simply does not apply. Indeed, even in *K & K Mf'g*, where the trial court precluded the customer from recovering on forgeries that occurred over a period of one year because the customer did not timely notify the bank of the forgeries, the trial court still allowed judgment for the customer on the 8 forged checks paid by the bank prior to the mailing of the first monthly statement indicating the forgeries were occurring. 129 Ariz. at 9, 628 P.2d at 46.

■■■■ Finally, we reject the Bank's contention that if Schoenfelder had reviewed the *previous* month's statement showing the check with a valid signature but an altered payee, he could have alerted the Bank somehow to avoid paying the subsequent forged checks. The record indicates that the Bank did not make this argument before the trial court to create a fact issue precluding summary judgment on this basis. On appeal from summary judgment, we will not consider new factual theories raised in an attempt to secure reversal of the trial court's determinations of law.[8] *Fendler v. Phoenix Newspapers, Inc.*, 130 Ariz. 475, 478 n. 2, 636 P.2d 1257, 1260 n. 2 (App.1981); *see also Prairie State Bank*, 155 Ariz. at 221 n. 1A, 745 P.2d at 968 n. 1A (party opposing motion cannot raise new factual theories *after* trial

court has ruled in favor of summary judgment).

## Conclusion

On the record presented to the trial court, we hold that the Bank failed to raise material issues of facts sufficient to preclude partial summary judgment in Schoenfelder's favor. We affirm the trial court's judgment and vacate that portion of the court of appeals opinion that is inconsistent with this decision.

## Attorneys' Fees

■■■■ On review in this court, Schoenfelder has requested attorneys' fees on the basis that he had to respond to a "frivolous" cross-issue raised by the Bank. We do not find the Bank's cross-issue frivolous. The Bank raised a colorable legal argument about which reasonable attorneys could differ; its ultimate lack of success does not render the argument totally without merit. *See Arizona Tax Research Ass'n v. DOR*, 163 Ariz. 255, 787 P.2d 1051 (1989). We therefore deny Schoenfelder's request for attorneys' fees on that basis. We note, however, that the trial court reserved its decision to award attorneys' fees, pursuant to A.R.S. § 12–341.01, pending the final outcome of this litigation. We believe that at this point in the litigation Schoenfelder has prevailed on an issue of law "sufficiently significant that the appeal may be considered as a separate unit." *Wagenseller v. Scottsdale Mem. Hosp.*, 147 Ariz. 370, 393–94, 710 P.2d 1025, 1048–49 (1985). We therefore authorize the trial court to award fees to Schoenfelder as the prevailing party on this issue, pursuant to A.R.S. § 12–341.01, including an award for appellate proceedings to this point. *See Leo Eisenberg & Co. v. Payson*, 162 Ariz. 529, 785 P.2d 49 (1989); *see also Andrew S. Arena, Inc. v. Superior Court*, 163 Ariz. 423, 788 P.2d 1174 (1990).

---

8. We note that this rule is procedural, not substantive, and that we have in the past, in our discretion, suspended it when an issue was raised in the trial court but not in the court of appeals, or when the case involved "issues of statewide importance, those of constitutional dimension or situations in which the public interest is better served by having the issue considered rather than deferred." *Dombey*, 150 Ariz. at 482, 724 P.2d at 568, citing *Barrio v. San Manuel Div. Hosp.*, 143 Ariz. 101, 104, 692 P.2d 280, 283 (1984); *Ruth v. Industrial Comm'n*, 107 Ariz. 572, 573–74, 490 P.2d 828, 829–30 (1971). We do not believe that the Bank's "altered check argument" falls within one of these exceptions.

We affirm the partial summary judgment entered by the trial court and remand this matter for an award of fees to Schoenfelder.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and MOELLER, JJ., concur.