[Civ. No. 15258. Fourth Dist., Div. Two. Aug. 26, 1975.]

KENDALL YACHT CORPORATION et al.,
Plaintiffs and Respondents, v.
UNITED CALIFORNIA BANK,
Defendant and Appellant.

**COUNSEL**

Donnelly, Clark, Chase & Johnson and Michael M. Gless for Defendant and Appellant.

Butler & Schroeder and Edgar H. Hayden, Jr., for Plaintiffs and Respondents.

**OPINION**

**McDANIEL, J.**—Kendall Yacht Corporation (hereinafter "Corporation") and Lawrence and Linda Kendall filed a complaint against the United California Bank (hereinafter "Bank") and Ron Lamperts, a United California Bank loan officer, to recover damages for injuries allegedly suffered as a consequence of the Bank's breach of agreements to loan money to the Corporation. The Bank cross-complained for unpaid balances on loans made to the Corporation and guaranteed by the Kendalls, the incorporators of the Corporation. After trial by court, the court found that the Bank had wrongfully dishonored checks of the Corporation and awarded $26,000 each to Mr. and Mrs. Kendall as

compensatory damages against Lamperts and the Bank and $10,000 punitive damages against the Bank. The Bank was awarded judgment on its cross-complaint in the principal sum of $26,691 plus interest. The Bank appeals.

Lawrence and Linda Kendall were officers and the prospective principal shareholders of the Corporation which was formed in May of 1969 to build and sell fiberglass cruising yachts. The Corporation never issued stock and was undercapitalized. Through the Corporation Mr. Kendall contracted to build yachts upon special order for customers. The customers were required to pay in advance for each stage of construction of their respective yachts, and these stage payments were the Corporation's sole source of income.

The Corporation had a payroll checking account and a general business checking account with the Bank. On September 4, 1970, Kendall spoke with Ron Lamperts, a loan officer of the Bank, in an effort to obtain financing for the Corporation. The Corporation was in debt and was having serious financial problems. In order to gain a solid financial footing, it appeared that it would be necessary to arrange for substantial equity capital or long-term financing. After familiarizing himself with the Corporation's financial position, Lamperts agreed to make a 90-day loan of $14,000 to enable it to continue operations while Kendall tried to raise capital elsewhere. Mr. and Mrs. Kendall executed a personal guarantee of the loan. On October 5 the Corporation repaid $3,000 on this loan. No further payments were ever made.

Around the first of October one of the Corporation's customers indicated his wish to sell his contract order for a yacht. The yacht, termed *Hull Five*, was then in the initial stages of construction. The price of the yacht had risen substantially over the amount which the purchaser had contracted to pay. Thus, in the hope of reselling it at a higher price, Kendall negotiated a right to repurchase the boat from the customer for the amount of the initial payments which had been made under the contract. When Kendall related this to Lamperts, Lamperts promised, once *Hull Five* was finished that the Bank would loan $25,000 to the Corporation on a long-term note secured by a lien on the yacht. Lamperts urged Kendall to complete the construction of *Hull Five* as soon as possible, and thus Kendall, with Lamperts' knowledge, began to concentrate his efforts on *Hull Five*. This necessitated slowing down or stopping work on other yachts, thereby delaying the Corporation's receipt of stage payments and exacerbating its cash flow problems.

Shortly after the discussion noted regarding *Hull Five*, the Corporation found itself without sufficient funds on deposit in its several accounts to cover checks it needed to write for payroll and operating expenses. Lamperts told Kendall that the Bank would honor certain of the Corporation's checks despite the lack of sufficient funds on deposit. The terms of this agreement were vague; Kendall contended that Lamperts promised to honor overdrafts until such time as the Corporation was "out of the woods." The Kendalls continued to write checks for supplies, payroll, and other operating expenses, and the Corporation's accounts were continuously overdrawn from mid-October through November and December. However, not all of the overdrafts were honored by the Bank.

By the end of October, the Corporation's accounts were overdrawn by approximately $6,000. The Corporation executed a note to the Bank for this amount, thus temporarily clearing the accounts. Also, at this time, the Kendalls executed a new guarantee whereby they assumed personal liability for the Corporation's debts up to $20,000.

On November 20, after *Hull Five* had been launched and was near completion, Lamperts told Kendall that the Bank would not make the promised $25,000 loan. A check subsequently written by the Corporation to repurchase *Hull Five* was dishonored by the Bank. The Bank did continue to honor some overdrafts through December. On December 30 Lamperts called Mrs. Kendall and told her that the Bank would no longer honor any of the Corporation's checks. Soon thereafter the Corporation's assets were seized and sold at auction by the Internal Revenue Service for nonpayment of taxes.

During October, November, and December, the Bank honored overdrafts of the Corporation totaling in excess of $15,000. There were also a number of overdrafts written during these months which were not honored by the Bank. Some of these were to suppliers and others were payroll checks to employees. In addition, the Bank failed to honor a check written to Insurance Company of North America to cover a premium for workmen's compensation insurance. The Kendalls were not aware that this check had been "bounced" until after one of their employees had been injured and they had been notified by Insurance Company of North America that their insurance had been terminated for nonpayment of premium.

After the collapse of the business, the Kendalls understandably had a number of enemies in the community. They were accused of having

breached the trust of their former suppliers and employees and of having milked the Corporation of its funds and placed them in a Swiss bank account. They were repeatedly threatened with legal action and physical harm; they suffered acts of vandalism such as eggs and oil being thrown at their cars. Mr. Kendall's subsequent employer was contacted and threatened by creditors of the Corporation. Criminal charges were brought against Mrs. Kendall for writing checks against insufficient funds; the charges were dismissed shortly before she was brought to trial on them. The Kendalls were required to appear and answer charges in administrative proceedings involving dishonored payroll checks and the Corporation's failure to carry workmen's compensation insurance. Each testified to experiencing severe emotional distress and humiliation as a result of these matters. They also testified to marital problems which were allegedly caused by the stress brought on by the failure of the business.

The trial court found that the Bank "encouraged, promised and represented to the plaintiffs to expect that [the Bank] would pay a large number of Kendall Yacht Corporation checks written by the plaintiffs" for the operation of the business without regard to whether there would be sufficient funds on deposit to cover the checks when they were presented for payment; that the Kendalls wrote numerous checks in reliance on the Bank's promises and with the expectation that they would be honored as overdrafts; that some such checks, including checks to suppliers, employee payroll checks, and the check for workmen's compensation coverage, were not honored by the Bank; that the Kendalls were induced by the promises of the Bank to endanger their credit and "to incur obligations that would not otherwise have been incurred, to violate the criminal law, and to suffer personal distress of varying kinds;" and that suppliers and employees were induced by the acts of the Bank to furnish supplies and labor to the Kendalls and to accept checks in payment which were subsequently not honored by the Bank. The court concluded that the failure of the Bank to honor the overdrafts constituted a "wrongful dishonor" under California Uniform Commercial Code section 4402, and that as a proximate consequence thereof Mr. and Mrs. Kendall incurred attorney's fees in criminal and civil proceedings brought against them and suffered emotional distress and damage to their reputations. The court awarded $26,000 to each of the Kendalls as compensatory damages and assessed $10,000 against the Bank as punitive damages. The court awarded judgment to the Bank

against the Corporation for the amounts loaned to it and against the Kendalls on their personal guarantee of the Corporation's debts.[1]

On this appeal, the Bank does not challenge the sufficiency of the evidence to support the court's findings of fact, nor does it attack the court's conclusions that the Bank's acts constituted wrongful dishonoring of checks under California Uniform Commercial Code section 4402, nor that the damages suffered by the Kendalls were proximately caused thereby. We therefore do not address these questions but confine our inquiry solely to the specific contentions made by the Bank.

The Bank contends first that under California Uniform Commercial Code section 4402 the wrongful dishonor of a check of a *corporation* does not give a cause of action for damages to individual officers and shareholders of the corporation. California Uniform Commercial Code section 4402, which represents section 4-402 of the Uniform Commercial Code, reads as follows: "A payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. When the dishonor occurs through mistake liability is limited to actual damages proved."[2] The Bank relies on *Loucks* v. *Albuquerque National Bank* 76 N.M. 735 [418 P.2d 191], where it was held that under Uniform Commercial Code section 4-402 individuals doing business as partners could not recover for damages to their personal credit, good reputation, and business standing which resulted from the wrongful dishonor of checks written on a partnership account. The court noted that Uniform Commercial Code section 4-402 states that a bank "is liable to its customer"; that Uniform Commercial Code section 4-104(1)(e) defines "customer" as "any person having an account with a bank"; that section 1-201(30) defines "person" as including "an individual or an organization"; and that under section 1-201(28) a "partnership" was embraced within the term "organization." After observing further that a partnership is recognized as a separate legal entity for at least some purposes,

---

[1]The judgment in favor of Bank against the Corporation was in the following amounts: $11,000 plus interest of 11 percent per annum from October 5, 1970; $6,000 plus interest of 11 percent per annum from October 27, 1970; and $9,691 plus interest of seven percent per annum from January 29, 1971. The Kendalls were held liable for $20,000 of these amounts plus interest.

[2]Section 4-402 of the Uniform Commercial Code contains additional language, as follows: "If so proximately caused and proved damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case." California did not adopt these latter two sentences. (See West's Com. Code Ann., § 4402, comment at pp. 636-638, and materials quoted therein.)

the court concluded that "[t]he partnership was the customer, and any damages arising from the dishonor belonged to the partnership and not to the partners individually." (*Id.,* at p. 197.)

It is not clear whether the New Mexico court meant to say that in every case where an account stands in the name of a partnership or a corporation, only the business entity may recover under section 4-402, regardless of the circumstances. Such a narrow and technical reading of the statute and the term "customer" does not seem warranted. ■ The purpose of the statute—to hold banks accountable for damages proximately caused by wrongful dishonors—is more readily served by allowing a flexible and reasonable interpretation of the word "customer."

We would certainly not hold as a general proposition that the shareholders or officers of a corporation could recover under section 4402 for the wrongful dishonor of a corporation check. Here, however, it is difficult to avoid the conclusion that Mr. and Mrs. Kendall were as much "customers" of the Bank within the contemplation of the statute as was the Corporation. Lamperts and the Bank looked directly to the Kendalls to satisfy the obligations of the Corporation. They were required to execute a personal guarantee of the initial $14,000 loan, and later they were required to increase that guarantee to $20,000 to cover the additional credit the Bank was extending to the Corporation in the form of honoring its overdrafts. The reason the Bank required the guarantees is obvious. The Corporation had never issued shares and was undercapitalized; it was, in effect, nothing but a transparent shell, having no viability as a separate and distinct legal entity. The Kendalls alone were controlling its financial affairs and were personally vouching for its fiscal responsibility. Not only the Bank, but also the suppliers and employees of the Corporation knew that this was the situation. They too—in some cases at the behest of Lamperts—were placing their faith in the Kendalls to make good on the corporate debts. Thus it was entirely forseeable that the dishonoring of the Corporation's checks would reflect directly on the personal credit and reputation of the Kendalls and that they would suffer the adverse personal consequences which resulted when the Bank reneged on its commitments. Under these circumstances we would elevate form over substance if we were to hold that the wrong defined by section 4402 was done only to the Corporation and that the Kendalls as individuals could not recover therefor.

The Bank's next contention is that there is insufficient evidence to support the award of damages to the Kendalls on the theory of intentional infliction of emotional distress. No reason having been shown why the judgment cannot be sustained under Commercial Code section 4402, we need not address this issue.

There is some suggestion in the Bank's brief that damages may not be recovered for emotional distress under Commercial Code section 4402. In so doing, it cites the rule that damages for mental suffering or injury to reputation resulting from breach of contract are not recoverable. (*Westwater* v. *Grace Church,* 140 Cal. 339, 342 [73 P. 1055].) ■ But it has been held in this state that a cause of action for wrongful dishonor of a check sounds in tort as well as in contract (*Weaver* v. *Bank of America,* 59 Cal.2d 428, 431 [30 Cal.Rptr. 4, 380 P.2d 644]), and "if the conduct is tortious, damages for emotional distress may be recovered despite the fact that the conduct also involves a breach of contract." (*Fletcher* v. *Western National Life Ins. Co.,* 10 Cal.App.3d 376, 400 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

The Bank also cites *Allen* v. *Bank of America,* 58 Cal.App.2d 124, 131 [136 P.2d 345], and *Meadows* v. *First Nat. Bank of Harlingen* (Tex. Civ. App. 1941) 149 S.W.2d 591, 593, which state that damages for emotional distress caused by wrongful dishonor of a check are not recoverable. However, in *Weaver* v. *Bank of America, supra,* the court distinguished and implicitly disapproved these two cases. In *Weaver* the plaintiff had been arrested as a result of the defendant's dishonoring of her check. The court addressed the question of "whether a plaintiff's suffering which occurs incident to an arrest" constituted "actual damage" under former Civil Code section 3320, the predecessor of California Uniform Commercial Code section 4402.[3] (*Weaver* v. *Bank of America, supra,* 59 Cal.2d 428, 437.) In answering this question in the affirmative, the court noted that the language in *Allen* rejecting recovery for mental suffering was dictum, and that the decision in· *Meadows* "pertained only to the common-law standard of recovery." (*Weaver* v. *Bank of America, supra,* fn. 13 at p. 437.) If, as held in *Weaver,* a plaintiff

[3] Former Civil Code section 3320 read: "No bank shall be liable to a depositor because of the nonpayment through mistake or error, and without malice, of a check which should have been paid unless the depositor shall allege and prove actual damage by reason of such nonpayment and in such event the liability shall not exceed the amount of damage so proved." There is nothing in the language of or comments to California Uniform Commercial Code section 4402 indicating that its framers intended to alter the measure of damages applied by the courts under the former provision. (See West's Com. Code Ann., § 4402, comment at pp. 636-638, and materials quoted therein.)

may recover damages for the suffering which occurs incident to an arrest, there is no reason to bar recovery of damages for the mental distress attending the types of consequences experienced here, which included criminal and administrative investigation and charges as well as various acts of harassment and vandalism. The Kendalls did not merely allege a subjective state of discomfort at having their checks dishonored; rather, they gave proof of objectively verifiable events which followed the dishonoring of their checks and which would have induced mental suffering in any reasonable person.

Lastly, the Bank argues that there was insufficient evidence to support the award of punitive damages. Punitive damages may be recovered only where it is shown that the defendant was guilty of "oppression, fraud, or malice." (Civ. Code, § 3294.) The court below found that the Bank's dishonoring of checks was done "intentionally, maliciously, and oppressively." There is neither a reference in the findings nor any evidence of fraudulent conduct by the Bank. Thus the question presented is whether there was substantial evidence from which the court could have inferred that the Bank acted oppressively and maliciously.

■ Malice implies "an act conceived in a spirit of mischief or with criminal indifference towards the obligations owed to others. There must be an intent to vex, annoy or injure. . . . Mere negligence, even gross negligence, is not sufficient to justify such an award." (*Gombos* v. *Ashe,* 158 Cal.App.2d 517, 527 [322 P.2d 933].) Oppression has been defined as " ' "An act of subjecting to cruel and unjust hardship." ' . . . 'Unjust or cruel exercise of authority or power, esp. by the imposition of burdens.' " (*Roth* v. *Shell Oil Co.,* 185 Cal.App.2d 676, 681-682 [8 Cal.Rptr. 514].) At root, both malice and oppression have to do with an "evil motive, the *animus malus,* shown by malice in fact or by its allied malign traits and characteristics evidenced by fraud or 'oppression.' An award of exemplary damages cannot be based on mere speculation; it depends instead on a definite showing of a willingness to vex, harass or injure consistent with a wrongful intent to injure." (*Id.,* at p. 682.)

■ We are unable to find in the record proof of an "evil motive" on the part of the Bank. The evidence discloses only a vague and ill-defined commitment by the Bank to honor overdrafts. Mr. Kendall testified that, when he found himself lacking sufficient current income to meet production expenses, Lamperts told him the Bank would "stick with us" until "we were out of the woods." What were the limits of this commitment? How long was the Bank required to honor the Corpora-

tion's checks? How many of the checks was it required to pay? The trial court did not find that the Bank had assumed responsibility for any and all checks the Kendalls might write (it found that the Bank encouraged the Kendalls to expect that a "large number" of checks would be honored). The Bank did in fact pay a substantial number of overdrafts, totaling over $15,000 by the end of December. The court concluded that the Bank's conduct induced the Kendalls reasonably to believe that additional checks which were not honored were also going to be paid. This inference may have been sufficient to render the Bank liable for compensatory damages, but something more is required to justify the award of punitive damages. Evidence of an evil motive is required, a showing that the Bank deliberately breached a recognized duty to the plaintiffs with knowledge that the breach was likely to result in serious injury. On the record before us, and particularly in view of the vagueness of the understanding between the parties, it remains purely speculative as to whether the Bank acted with such malice rather than out of a bona fide disagreement over how far the Bank was required to go in helping the Kendalls with their financial problems. "[A] tort committed by mistake, in the assertion of a supposed right, or without any wrong intention, and without such recklessness as evinces malice or a conscious disregard of the rights of others, does not warrant punitive damages." (*Roth* v. *Shell Oil Co., supra,* 185 Cal.App.2d 676, 682.) We therefore conclude that the award of punitive damages cannot stand.

That portion of the judgment awarding punitive damages against the Bank is reversed. The judgment is affirmed in all other respects.

Gardner, P. J., and Tamura, J., concurred.