NGUYEN, Circuit Judge,
dissenting:
Bankruptcy courts “are courts of equity” that “applfy] the principles and rules of *973 equity jurisprudence.” Young v. United States, 535 U.S. 43, 50, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) (quoting Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939)). There is nothing equitable about today’s decision.
Donald Buresh, Sharon Phillips, and Lisa Henry are not Michael Bello’s family members, friends, or even close associates. They are a married couple who sold their property to Bello to fund their retirement and a small business owner who performed design and construction services for him. Unbeknownst to them, the checks with which Bello paid them, which bore the name of his company, were in fact drawn from a sham bank account that he created to fraudulently siphon money away from his company and use for his personal expenses. Their dealings with Bello were legitimate, arms-length transactions. Yet they each now owe Bello’s creditors hundreds of thousands of dollars—a ruinous sum for most retirees and small businesses. I strongly disagree with this result.
I.
For many years, “we employed a hybrid ‘dominion and control’ test to identify initial transferees.” In re Mortg. Store, Inc., 773 F.3d 990, 996 (9th Cir. 2014) (citing In re Video Depot, Ltd., 127 F.3d 1195, 1199-1200 (9th Cir. 1997)). Because the hybrid test incorporated the “pragmatic” control test used in other circuits, id., it would have produced the correct result here without fuss and held Bello personally liable for his fraudulent acts as the initial transferee.
Unfortunately, in In re Incomnet, Inc., 463 F.3d 1064 (9th Cir. 2006), “we explicitly rejected the control test’s flexible, equitable approach and embraced the pure dominion test.” Mortg. Store, 773 F.3d at 996. There was no reason to do so. Incomnet's “resolution ... [did] not turn on the question of which of the[ ] two standards governs in this circuit.” Incomnet, 463 F.3d at 1069-70.
Here, while I disagree with the majority that the Bureshes and Henry were the initial transferees under the dominion test, the very fact of our disagreement shows how difficult it can be to determine who had legal control over funds in situations where practical control is clear. We should consider ditching the dominion test and adopting the control test used successfully by other circuits. At the very least, we should return to a hybrid approach that allows us “to step back and evaluate a transaction in its entirety to make sure that [our] conclusions are logical and equitable.” Mortg. Store, 773 F.3d at 996 (quoting In re Chase & Sanborn Corp., 848 F.2d 1196, 1199 (11th Cir. 1988)).
II.
Even applying the dominion test, as we must, the Bureshes and Henry were not the initial transferees. The majority concludes that Bello didn’t possess legal title to the misappropriated funds or the ability to freely appropriate them because the sham bank account actually belonged to Walldesign. According to the majority, Bello merely “abused his power as a principal to direct company funds to third parties for his own benefit.” Maj. Op. at 966. I disagree. Under the dominion test, the sham account never belonged to Walldesign.
As the majority acknowledges, in a one-step transaction, “a principal who directs a debtor corporation ... to pay for a personal debt is not an initial transferee” because “[t]he mere power of a principal to direct the allocation of corporate resources does not amount to legal dominion and control.” Video Depot, 127 F.3d at 1199 (citing In re S.E. Hotel Props. LP, 99 F.3d 151, 155-56 *974 (4th Cir. 1996); Rupp v. Markgraf, 96 F.3d 936, 941 (10th Cir. 1996)). Therefore, had Bello paid the Bureshes and Henry directly from Walldesign’s account at Comerica Bank, the transactions unquestionably would have taken place in one step.
In a two-step transaction, “a principal may establish legal control and dominion by first directing a transfer into his or her personal bank account and then making the payment from his personal account to the creditor.” Id. (citing Rupp, 95 F.3d at 939). The question here then is whether the second account, which Bello secretly used as his “personal piggy bank” in stealing money from Walldesign, Maj. Op. at 970, should be treated as Bello’s personal account or imputed to the company. In that regard, “[s]tate law ... determines the nature and extent of a debtor’s interest in property.” In re Cohen, 300 F.3d 1097, 1104 (9th Cir. 2002) (quoting In re Richmond Produce Co., 151 B.R. 1012, 1016 (Bankr. N.D. Cal. 1993)).
The majority says that “California law imputes to a corporation any ‘Knowledge of an officer of [that] corporation within the scope of his duties,’ ” and Bello “acted within the scope of his duties in opening a corporate bank account.” Maj. Op. at 970 (quoting Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP, 133 Cal.App.4th 658, 35 Cal.Rptr.3d 31, 46 (2005)). But “in order to have authority [to act on behalf of a corporation] which is implied in fact the agent, be he president or general manager of a corporation, or both, must be performing an act which is ‘appropriate in the ordinary course of its business.’ ” Meyer v. Glenmoor Homes, Inc., 246 Cal.App.2d 242, 54 Cal.Rptr. 786, 794 (1966) (quoting Mem’l Hosp. Ass’n of Stanislaus Cnty. v. Pac. Grape Prods. Co., 45 Cal.2d 634, 290 P.2d 481, 483 (1955)).
Meyer clearly rejected the majority’s conclusion that a corporate officer’s fraudulent transaction should be imputed to the company merely because the officer had authority to perform that type of transaction in other circumstances. In Meyer, the general manager had authority to buy land on the corporation’s behalf and had previously done so by taking title in the name of individuals, and such transactions were sometimes signed by only one officer and did not always appear in the corporate minutes. Id. at 795. In the transaction at issue, the general manager secretly purchased land for himself in exchange for a promissory note purportedly obligating the corporation.
The court held that the transaction could not be imputed to the corporation because the corporation “[n]ever engaged in transactions where it became obligated to pay for land ... which was conveyed to another for the use and benefit of that grantee as distinguished from the use and benefit of the corporation.” Id. (emphasis added). “The knowledge acquired by the agent who is acting adversely to his principal will not be attributed to the principal.” Id. at 801 (citing People v. Parker, 235 Cal.App.2d 86, 44 Cal.Rptr. 900, 905-06 (1965); Commercial Lumber Co. v. Ukiah Lumber Mills, 94 Cal.App.2d 215, 210 P.2d 276, 279 (1949)); see also Peregrine Funding, 35 Cal.Rptr.3d at 47 (“Nor is a corporation chargeable with the knowledge of an officer who collaborates with outsiders to defraud the corporation.” (citing Meyer, 54 Cal.Rptr. at 801)).[1]
*975 The circumstances here are the same. No one disputes that Bello had authority generally to open a bank account on Walldesign’s behalf. But Bello’s authority to do so didn’t extend to opening a secret account solely for his own personal benefit at the company’s expense. He owed Walldesign a fiduciary duty to act in good faith in the company’s best interests. See, e.g., Sheley v. Harrop, 9 Cal.App.5th 1147, 215 Cal.Rptr.3d 606, 624 (2017). Because Bello was acting adversely to Walldesign in opening the sham account, he did so in his personal capacity, not as an officer of the company.
That Bello used his ostensible authority as Walldesign’s president in opening the account makes no difference. For example, in Software Design & Application, Ltd. v. Hoefer & Arnett, Inc., 49 Cal.App.4th 472, 56 Cal.Rptr.2d 756 (1996), a financial consultant with authority to handle a corporation’s investment funds placed the funds into a brokerage account in the name of a fictitious partnership with the same name as the corporation. He never reported the brokerage accounts to the corporation and had the monthly statements sent to a post office box that he falsely represented as the partnership’s. Id. at 759. The court held that at the time of these deposits, the consultant “had already stolen money and securities from [the ovmers], having wrested control of these funds by placing them in bogus accounts.” Id. at 763.
Similarly in Rodriguez v. Bank of the West, 162 Cal.App.4th 454, 75 Cal.Rptr.3d 543 (2008), the office manager of a law firm opened two sham bank accounts in the lawyer’s name and forged his signature on numerous checks that she used to steal client money from the law firm. Id. at 544-45. In rejecting the lawyer’s negligence claims against the banks, the court explained that the banks had no duty to the lawyer because, despite being the named accountholder, he was not their customer: “he did not consent to the creation of any of the accounts and, indeed, did not even know of their existence until after [the office manager’s] wrongful acts were completed.” Id. at 546. Instead, the office manager was the banks’ true customer because she “opened accounts at banks at which [the lawyer] had no existing relationship, then converted the money to her own use.” Id. at 548. The court found these facts “indistinguishable” from Software Design. Id.
Here too, the putative accountholder, Walldesign, was not the true owner of Bello’s sham bank account. As in both Software Design and Rodriguez, the rogue agent opened a secret bank account, purportedly on behalf of the principal, for the agent’s own nefarious ends. As in Rodriguez, Walldesign had no relationship with the bank. As in Software Design, the account address of record—Bello’s home— was one belonging to him personally rather than to Walldesign.
This was a classic two-step transaction. First, Bello converted corporate funds by transferring them into his personal account, making him the initial transferee. Then, he transferred the funds to others, including the Bureshes and Henry, who were subsequent transferees.
III.
In arguing that Bello wasn’t in the best position to monitor the fraud, the majority quips that “foxes (like corporate cheats) rarely guard henhouses (like corporate treasuries) with much success.” Maj. Op. at 965 (citing Mortg. Store, 773 F.3d at 998 n.1). But allowing a corporate cheat to easily shift liability for his wrongdoing *976 onto innocent third parties simply by signing the corporation’s name on a secret bank account instead of his own only encourages this kind of embezzlement. As the majority notes, the Committee is entitled to a single satisfaction from Bello, on the one hand, and the Bureshes and Henry on the other. Id. at 973 (citing 11 U.S.C. § 550(d)). Every dollar the Committee is able to recover from the Bureshes and Henry is a dollar for which Bello is off the hook.
The majority admits that its holding “may be” inequitable, Maj. Op. at 972, but suggests that the Bureshes and Henry nonetheless should have monitored for fraud, since they “had some indication of ,.. irregularities” because Bello’s checks bore Walldesign’s name. Id. at 968-69. I disagree. Businesses often pay for their executives’ personal expenses, and it’s not unusual for individuals to structure their transactions through corporations for tax reasons. I don’t see anything inherently suspicious about Bello paying his personal debts from the account of a closely-held corporation. Recipients of such payments, like the Bureshes and Henry, are generally not well placed to question the legitimacy of a reputable organization’s bank account,
I respectfully dissent.

. The majority speculates that Bello’s wife, who was a signatory to the sham account despite not having any affiliation with Wallde-sign, could have been "acting in cahoots with her husband.” Maj. Op. at 968. If so, then the sham account was not attributable to Wallde-sign because Bello was collaborating with an outsider to defraud it. At a minimum, this is a factual issue that should be resolved by the bankruptcy court before we decide as a mat *975 ter of law that the account belonged to the corporation.